**UNION PLANTERS NATIONAL BANK OF MEMPHIS, Plaintiff-Appellant,**

v.

**COMMERCIAL CREDIT BUSINESS LOANS, INC., Defendant-Appellee.**

**No. 79–1191.**

United States Court of Appeals, Sixth Circuit.

Argued Oct. 15, 1980.

Decided May 18, 1981.

Rehearing Denied July 20, 1981.

Glen Reid, Jr., Robert M. Johnson, Wildman, Harrold, Allen, Dixon & McDonnell, Memphis, Tenn., for plaintiff-appellant.

J. Alan Hanover, Michael E. Goldstein, Hanover, Walsh, Barnes & Jalenak, Memphis, Tenn., for defendant-appellee.

Before ENGEL and KEITH, Circuit Judges, and CELEBREZZE, Senior Circuit Judge.

CELEBREZZE, Senior Circuit Judge.

The principal issue in this case is whether a loan participation agreement executed between two financial institutions constitutes a "security" within the meaning of the Securities Exchange Act of 1934.

## I.

Plaintiff, Union Planters National Bank of Memphis (the Bank) appeals from a judgment notwithstanding the verdict and the conditional grant of a new trial entered in favor of the defendant, Commercial Credit Business Loans, Inc.[1] (CCBL). In its the alternative, the judgment notwithstanding

---

1. When a trial court grants judgment notwithstanding the verdict and grants a new trial in

complaint the Bank sought recission or damages from CCBL for allegedly fraudulent representations made by CCBL's agents which induced the Bank to purchase a participation in a line of credit extended by CCBL to Donald Furniture Co. (Donalds). Specifically, the Bank alleged that the loan participation agreement constituted a "security" under federal law and that CCBL made false statements of material fact, omitted to state material facts necessary to make the statements not misleading, and employed a device, scheme or artifice which operated as a fraud upon the Bank, all in violation of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. sections 78j (1970),[2] Rule 10b–5 of the Securities and Exchange Commission, 17 C.F.R. section 240.10b–5,[3] and principles of Tennessee common law.

The district court initially held that the loan participation agreement was a security and allowed the Bank to present evidence on its federal law claims.[4] After six days of trial CCBL declined to offer any proof and the case was submitted to the jury together with three special verdicts.[5] The

---

the verdict is final and appealable, allowing us to review both rulings. *See* Fed.R.Civ.Pro. 50(c)(1).

This departure from the normal rule that a motion granting a new trial is interlocutory and non-appealable is justified by the obvious fact that the principal judgment is clearly final; the new trial grant will never be effective unless the judgment is overthrown. Since the principal judgment is appealable, it would be wasteful to hold that the court of appeals cannot review all that happened below in the event that it holds the grant of judgment notwithstanding the verdict to have been erroneous.

9 Moore's Federal Practice Sec. 110.08[3], at 122 (2d ed. 1948). Accordingly, we have jurisdiction to consider both the judgment notwithstanding the verdict and the conditional grant of a new trial. *See e. g. Bazile v. Bisso Marine Co., Inc.*, 606 F.2d 101, 104 (5th Cir. 1979), *cert. denied*, 449 U.S. 829, 101 S.Ct. 94, 66 L.Ed.2d 33 (1980).

2. 15 U.S.C. Sec. 78j provides in pertinent part:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails

(b) To use or employ in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

3. 17 C.F.R. Sec. 240.10b–5 provides:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a) To employ any device, scheme, or artifice to defraud.

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

4. Prior to trial the district court granted CCBL's motion to dismiss the Bank's claim for recission, holding that the Bank had waived its right to recission by continuing to accept payments from CCBL under the terms of the agreement.

In response to other CCBL motions, the court severed the issues of liability and damages, and ruled that simple negligence does not violate the federal securities laws. *See e. g. Adams v. Standard Knitting Mills, Inc.*, 623 F.2d 422, 428–31 (6th Cir.), *cert. denied sub nom., Adams v. Peat, Marwick, Mitchell & Co.*, 449 U.S. 1067, 101 S.Ct. 795, 66 L.Ed.2d 611 (1980).

5. 1. Did the defendant violate the United States laws and regulations pertaining to the sale of securities by making an untrue statement of a material fact or by omitting to state a necessary material fact concerning the creditworthiness of the accounts receivable of Donald Furniture Co., Inc. in connection with the negotiation for and the execution of Amendment No. 1 to Participation Agreement dated July 11, 1973?

Yes ____ No ____

2. Did the defendant commit commercial fraud against the plaintiff under the law of Tennessee by making a negligent misrepresentation concerning the credit-worthiness of the accounts receivable of Donald Furniture Co., Inc. in connection with the negotiation for and the execution of Amendment No. 1 to Participation Agreement dated July 11, 1973?

Yes ____ No ____

If you answer the above question "Yes", please answer the following question in the light of the instructions pertaining to the cause of action under the Tennessee law.

jury found in favor of the Bank on the federal securities count and the Tennessee negligent misrepresentation fraud claim, but also found the Bank guilty of contributory fault which proximately caused its injury. Judgment on the federal law liability issue was entered in favor of the Bank and a judgment in favor of CCBL was entered on the common law fraud claim because contributory negligence is a defense to the tort of negligent fraud. CCBL then moved for a judgment notwithstanding the verdict or for a new trial, and the Bank moved to alter or amend the judgment on the Tennessee common law count. Subsequently, the trial judge granted CCBL's motion for JNOV on the grounds that he had changed his mind and was now ruling that the participation purchased by the Bank was not a security. A conditional new trial was also granted on that issue because of what the trial judge felt were substantial errors in the formulation of the special verdicts and in the admission of certain testimony. We affirm the judgments entered for CCBL on the federal and state law claims.

II.

Donald Furniture Company was a retail seller of home furnishings. Its relationship with the Bank dated to 1946, when the Bank began lending money to Donalds. Those loans were secured by the company's accounts receivable. In 1968, Donalds was sold by its founders and owners, the Pelts family, to Gulf Life Insurance Company. In 1971, Donalds had an outstanding loan of $700,000.00 from the Bank, secured by a take-out commitment from Gulf Enterprises, the holding company for Gulf Life. Gulf Life eventually sold the Donald chain to Tenn-Ark Furniture World Corp. in 1972.

During the years 1946–1971, Donalds had experienced substantial growth and in 1971 sought new financing in the amount of $2 million. On October 21, 1971 two Donald's officials approached Mr. C. W. Irvine, the Union Planters officer in charge of the

Donald's account, regarding the possibility of the Bank participating with a finance company (CCBL) in a loan to Donalds. The Bank's participation was solicited because the Bank's interest charges were lower than CCBL's. Shortly thereafter, Irvine was approached by CCBL's representative, Oscar Edwards, to discuss further the loan participation.

When prospects for consummation of the participation appeared good, Donalds and CCBL executed a Revolving Loan Agreement on November 26, 1971. The Revolving Loan Agreement provided that Donald would receive continuous cash advances from CCBL based upon the value of all Donald's existing and future accounts receivable; the accounts receivable would also serve as collateral to secure the loan.

On December 17, 1971, the Bank and CCBL executed a Participation Agreement which provided that the Bank would participate to the extent of providing 50 percent of the first two million dollars advanced to Donalds. The Bank, in turn, received rights in Donald's accounts receivable commensurate with its 50 percent share of the loan. The collateral security was defined as any and all of Donald's accounts receivable. The value of that collateral was to be determined solely by CCBL, which was given, in the words of the trial judge, "practically unlimited discretion" in its role as lead bank administering the loan. The extent of CCBL's primacy in managing the loan to Donalds is reflected in Paragraph 7 of the Participation Agreement:

7. Commercial Credit may in its sole discretion approve or decline to approve the credit risk on and acceptability of Collateral; take, release, substitute or refuse Collateral or other security; give or withhold waivers, consents, extensions, adjustments, compositions or compromises; amend or refuse to amend the Financing Agreement or other agreements relating thereto; exercise or refrain from exercising rights, or take or refrain from

Was the plaintiff guilty of contributory fault which proximately caused an injury to the plaintiff?

Yes ——— No ———

taking action with respect to Advances, Collateral, other security or with respect to the Financing Agreement, or in any other way in making, handling, collecting, realizing upon, or enforcing repayment of Advances or Collateral or other security or the Financing Agreement of guaranties; and, without limitation, Commercial Credit makes no representations and assumes no responsibility with respect to Collateral, the Financing Agreement or other papers relating thereto, or to their value, validity or enforceability, or the correctness of any papers, statements or certificates made by the Customer.

The Participation Agreement also provided that the Bank would have access, upon request, to all CCBL records with regard to the loan; CCBL was obligated, however, to deliver to the Bank periodic statements reflecting the status of Donald's account with CCBL.

By March, 1972, Donalds had received the total two million dollars—one million each from the Bank and CCBL. Donald's need for cash infusion, however, was not satisfied by that loan alone, as CCBL continued lending money to Donalds pursuant to the separate Revolving Loan Agreement it had executed with Donalds. During the course of the next twelve months, CCBL advanced more than five million dollars to Donalds.

In supervising the progress of the loan, audits of Donald's financial records were conducted by a sister company of CCBL, Commercial Credit Management Corp. The primary purpose of these audits was to determine whether there was a proper flow of funds pursuant to the loan. If the audits revealed an unsatisfactory state of affairs, the results would be followed up by the CCBL official in charge of the loan, Frank Mederios.

The audit of August 17, 1972 turned up serious problems with respect to Donald's control over its accounts receivable—the collateral for the loan. Specifically, the auditor found that Donald's had "no control" over those accounts; that Donalds billed for unshipped merchandise making it impossible to establish a dollar value for those receivables; that the company's system of extending and refinancing receivables was not protected by CCBL's audit requirements; and that the company's reporting delays were unreasonable. In order to correct these deficiencies the auditor recommended the implementation of certain procedures to bring about some degree of control over the accounts receivable should CCBL choose to disregard his advice to discontinue the account. Neither the auditor's problematic diagnosis nor his recommendations were contained in the report given the Bank.

Donald's problems had not improved by the next audit on December 16, 1972. The same auditor again advised against continuing the account, observing that "Quantitatively, we do not know what we have . . . . Qualitatively, we are also unaware of our position." The audit report which CCBL forwarded to the Bank was an edited version which did not contain the adverse recommendation made by the auditor.

Several months later it appeared that Donald's situation was improving. The audit report of April 27, 1973, indicated that Donalds had made substantial progress in clearing up the problems associated with its control of the accounts receivable. Unlike the two previous reports, the April audit, authored by a different auditor, recommended that CCBL retain its account with Donalds. And despite any accounting problems, Donalds was apparently a healthy company. Both the Bank and CCBL received copies of the favorable financial statement for the year ending December 31, 1972 prepared by Donald's accountants, Haskins & Sells and dated March 2, 1973.

By April, 1973, Donalds was indebted to CCBL for 7.5 million dollars, in addition to the one million dollars it owed the Bank. At that time CCBL decided to increase the amount of its loan to Donalds by $750,000, raising the debt to $8,250,000. Donalds, however, anticipated a future need for 10 million dollars in credit.

On April 10, 1973, representatives from Donalds met with the Bank's executive, Irvine, and proposed that the Bank increase

its participation with CCBL from $1,000,000 to $5,000,000, or 50% of $10,000,000 total, available on a five-year revolving term basis. In the estimate of the Donald's officials, that amount of financing would satisfy their needs for at least two years during which time they expected to raise additional funds by a public stock offering. On April 13, 1973, the Bank advised Donalds that it was agreeable to a 50% participation in the $10,000,000 line of credit at the prime rate plus two points. Consequently, the Loan Participation Agreement was amended on July 11, 1973 to provide for a $10 million line of credit in which the Bank would have a 50% participation.[6] The Bank was therefore required to pay CCBL $3.2 million, reducing CCBL's exposure by that amount, and bringing the loan balance to $8.4 million. By October 22, 1973 the loan balance had reached the full $10 million.

In December, 1973, Irvine learned that CCBL unilaterally intended to increase Donald's financing to $12.5 million. Irvine contacted Mederios at CCBL to ask about the financing increase and to request copies of any recent audit reports. In a letter to Irvine dated December 28, 1973, Mederios wrote that he would have the final draft of the amendment increasing the line of the loan in about one week, and that CCBL's posture at that time was one of holding off consideration of any further expansion in 1974. In fact, however, CCBL and Donalds had executed the amendment to the Secured Term Loan Agreement over one month beforehand, on November 9, 1973. That amendment, while increasing the credit line, also extended the payout period of the loan. CCBL also forwarded an edited version of an audit of September 12, 1973, which omitted the adverse comments made by the auditor.

In February, 1974, Irvine and the Bank learned that Donalds was delinquent in paying some of its creditors. Irvine forwarded to CCBL a memo from the Bank's credit department, inquiring whether CCBL had similar information. According to Irvine's testimony, Mederios informed him that several checks had been made which did not show any serious trade slowness. A February 11, 1974, CCBL audit report, however, recommended that CCBL abandon Donalds because the company was delinquent in paying trade creditors. The Bank received a sanitized version of that audit in May, 1974.

In early 1974 Donalds experienced cash flow difficulty. On March 20, 1974, the Bank requested that CCBL repurchase its share of the loan. At that time Irvine believed that the Bank could so terminate its participation at any time. The Agreement, however, only permitted the Bank to decline to participate in future advances; there was no provision permitting it to rescind its involvement with regard to funds already advanced. Citing these provisions, CCBL declined to repurchase the Bank's share of the loan.

Donald's financial health worsened rapidly. By June, Donalds was in default by $1.7 million and delinquencies in the accounts receivable were rising. In September, 1974, Donalds was placed in bankruptcy. The Trustee turned over the accounts receivable to CCBL, which began to collect them, remitting to the Bank its share of the liquidation proceeds. When CCBL continued to refuse to repurchase the Bank's share, the Bank filed this action in February, 1975.

### III.

The threshold question in any action brought pursuant to the Securities Acts is whether a security exists. The search for the definition of a "security" must necessarily commence with the language of the statute. *Rubin v. United States*, 449 U.S. 424, 101 S.Ct. 698, 66 L.Ed.2d 633 (1981);

---

**6.** It was in the circumstances preceding this amendment increasing the Bank's participation to 50% that the alleged fraud (misrepresentations regarding the creditworthiness of Donald's accounts receivable) occurred; the Bank does not contend that there was fraud involved in the execution of the original Participation Agreement. In light of our disposition of the case, we need not decide whether the amendment of the Participation Agreement is "in connection with the purchase or sale of any security."

*Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 756, 95 S.Ct. 1917, 1935, 44 L.Ed.2d 539 (1975) (Powell, J., concurring).

■ Section 3(a)(10) of the Securities Exchange Act of 1934, 15 U.S.C. Sec. 78c(a)(10) provides:

(a) When used in this chapter, unless the context otherwise requires—

(10) The term 'security' means any note, stock, treasury stock, bond, debenture, *certificate of interest or participation* in any profit-sharing agreement or in any oil, gas, or other mineral royalty or lease, any collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, voting-trust certificate, certificate of deposit, for a security, or in general, any instrument commonly known as a 'security'; or *any certificate of interest or participation in,* temporary or interim certificate for, receipt for, or warrant or right to subscribe to or purchase, any of the foregoing; but shall not include currency or any note, draft, bill of exchange or banker's acceptance which has a maturity at the time of issuance of not exceeding nine months, exclusive of days of grade, or any renewal thereof the maturity of which is likewise limited. (Emphasis supplied.)

The Securities Act of 1933, 15 U.S.C. Sec. 77b(1) provides a similar definition of security, a definition which the Supreme Court has termed "virtually identical" to that of the Securities Exchange Act of 1934. *Tcherepnin v. Knight,* 389 U.S. 332, 335–336, 88 S.Ct. 548, 552–553, 19 L.Ed.2d 564 (1967). While both Acts contain admittedly broad definitions, not every commercial transaction is within their ambit. *See Curran v. Merrill Lynch, Pierce, Fenner and Smith,* 622 F.2d 216, 222 (6th Cir. 1980), *cert. granted* —— U.S. ——, 101 S.Ct. 1971, 68 L.Ed.2d 293 (1981). The literal inclusion of participation within the statutory definition of "security" is not dispositive of the question, however, in view of the provision in both Acts that the definitions apply "unless the context otherwise requires."[7] In interpreting the Securities Acts, the rules of statutory construction have been subordinated to the doctrine that courts will construe the provisions of a statute in a manner consistent with its dominant purpose and will carry out the generally expressed legislative policy by reading the text in light of the context.[8] *See SEC v. National Securities, Inc.,* 393 U.S. 453, 466 (1969). *SEC v. C. M. Joiner Leasing Corp.,* 320 U.S. 344, 350–51, 64 S.Ct. 120, 123, 88 L.Ed. 88 (1943). In fact, in determining the scope of the term "security," the Supreme Court has disregarded form in favor of substance and counselled that application of the federal securities statutes turns on the "economic realities" underlying a transaction. *United Housing Foundation, Inc. v. Forman,* 421

---

7. The antiliteralist approach of the Supreme Court in *Forman* and antecedent securities cases is at odds with *Lehigh Valley Trust Co. v. Central National Bank of Jacksonville,* 409 F.2d 989 (5th Cir. 1969), upon which the Bank relies. In *Lehigh Valley* the Fifth Circuit read the statute literally in holding that a participation agreement was a security within the statutes and Rule 10b–5. *Id.* at 992. That literal approach is now discredited even in that circuit. *See McClure v. First National Bank of Lubbock,* 497 F.2d 490, 493–94 (5th Cir. 1974); *Bellah v. First National Bank of Hereford,* 495 F.2d 1109, 1111–14 (5th Cir. 1974).

A new literalism emerged, however, in *Exchange National Bank of Chicago v. Touche Ross & Co.,* 544 F.2d 1126 (2d Cir. 1976), where the court found the *Forman* test to be of "dubious value" in the context of deciding whether unsecured subordinated notes purchased by the Exchange National Bank were securities. The best recourse, the court believed, was to follow the language of the Acts, which includes every note with a maturity period over nine months, unless the party asserting that there is no security demonstrates that the context requires otherwise. *Id.* at 1137–38.

8. The Congressional purpose was capsulized by the Supreme Court in *Forman,* 421 U.S. at 849, 95 S.Ct. at 2059:

The primary purpose of the Securities Acts of 1933 and 1934 was to eliminate serious abuses in a largely unregulated securities market. The focus of the Acts is on the capital market of the enterprise system: the sale of securities to raise capital for profit making purposes, the exchanges on which securities are traded, and the need for regulation to prevent fraud and to protect the interests of investors.

U.S. 837, 848, 95 S.Ct. 2051, 2058, 44 L.Ed.2d 621 (1975); *Tcherepnin v. Knight*, supra at 336. In focusing on the economic realities to distinguish securities transactions from commercial dealings, the Court has used a test which, in "shorthand form":

> ... embodies the essential attributes that run through all of the Court's decisions defining a security. The touchstone is (1) the presence of an investment (2) in a common venture (3) premised on a reasonable expectation of profits (4) to be derived from the entrepreneurial or managerial efforts of others.

*Forman, supra* at 852, 95 S.Ct. at 2060.[9]

In applying the *Howey-Forman* criteria in the context of commercial loan participations, the courts have divided on whether a security exists. A few courts have held that a loan participation is a security. *See Commercial Discount Corp. v. Lincoln First Commercial Corp.*, 445 F.Supp. 1263 (S.D.N.Y.1978); *NBI Mortgage Investment Corp. v. Chemical Bank*, (1976) Fed.Sec.L.Rep. (CCH) Par. 95,632 (S.D.N.Y.1976) and (1977) Fed.Sec.L.Rep. (CCH) Par. 96,066 (S.D.N.Y. 1977). A majority of the courts, however, have reached the opposite conclusion. *See American Fletcher Mort. Co. v. U. S. Steel*, 635 F.2d 1247, 1253–54 (7th Cir. 1980) *cert. denied*, —— U.S. ——, 101 S.Ct. 1982, 68 L.Ed.2d 300 (1981); *United Bank of Nashville v. Gunter*, 620 F.2d 1108, 1110 (5th Cir. 1980); *Manchester Bank v. Conn. Bank & Trust Co.*, 497 F.Supp. 1304, 1309–13 (D.N. H.1980); *Provident National Bank v.*

*Frankford Trust Co.*, 468 F.Supp. 448, 452–55 (E.D.Pa.1979); *FBS Financial, Inc. v. Clevetrust Realty Investors*, (1978) Fed.Sec. L.Rep. (CCH) Par. 96,341 (N.D. Ohio 1977). We agree with the wisdom of this position, and for the reasons that follow conclude that the loan participation purchased by the Bank does not constitute a security.

## PRESENCE OF AN INVESTMENT

In passing on the first phase of the *Howey-Forman* test, several courts have recognized the dilemma inherent in distinguishing between investment and commercial transactions:

> In one sense, every lender of money is an investor since he places his money at risk in anticipation of profit in the form of interest. Also, in a broad sense every investor lends his money to a borrower who uses it for a price and is expected to return it one day.

*FBS Financial, supra*, at 93,156 *quoting C.N.S. Enterprises, Inc. v. G & G Enterprises, Inc.*, 508 F.2d 1354, 1359 (7th Cir.), *cert. denied*, 423 U.S. 825, 96 S.Ct. 38, 46 L.Ed.2d 40 (1975).

■ To assist in isolating the investment transactions which the Securities Acts were intended to cover, the courts have developed several modes of analysis, the most popular of which is the "risk capital" test enunciated in *Great Western Bank & Trust v. Kotz*, 532 F.2d 1252, 1257 (9th Cir. 1976).[10] *See also United Cal. Bank v. THC*

---

9. The genesis of this test is *SEC v. W. J. Howey Co.*, 328 U.S. 293, 301, 66 S.Ct. 1100, 1104, 90 L.Ed. 1244 (1946) and the only deviation from the *Howey* language is the omission of the prefatory term "solely" from the phrase "profits to come solely from the efforts of others." *Id.* at 301, 66 S.Ct. at 1104. Several courts have interpreted the "solely" requirement to mean only that the "crucial" profit making efforts be made by a third party. *Commander's Palace Park v. Girard & Pastel Corp.*, 572 F.2d 1084 (5th Cir. 1978); *SEC v. Koscot Interplanetary, Inc.*, 497 F.2d 473, 479 (5th Cir. 1974); *SEC v. Glenn W. Turner Enterprises*, 474 F.2d 476 (9th Cir.), *cert. denied*, 414 U.S. 821, 94 S.Ct. 117, 38 L.Ed.2d 53 (1973). The Supreme Court declined to adopt or reject the modification in *Forman*, 421 U.S. at 852, n.16, 95 S.Ct. at 2060, n.16, although the shift in

semantics in the fourth phase from *Howey* to *Forman* is the Court's own. *See also Williamson v. Tucker*, 632 F.2d 579, 593–94 (5th Cir. 1980).

10. For a critique of the shortcomings of this test, see Note, *Bank Loan Participations as Securities: Notes, Investment Contracts, and the Commercial/Investment Dictionary*, 15 Duquesne L.Rev. 261, 286–91 (1976–77). Although, the Second Circuit criticized this test in *Exchange National Bank, supra*, it is evident that arguing from the phrase "unless the context otherwise requires" invites consideration of many of the same factors present in the "risk capital" analysis. *See Exchange National Bank*, 544 F.2d at 1138–39. Were we not constrained by the *Forman* framework, we might be tempted to examine a fresh approach to the

**1182**

*Financial Corp.*, 557 F.2d 1351, 1358 (9th Cir. 1977). The "risk capital" test focuses on six criteria: 1) time; 2) collateral; 3) form of the obligation; 4) circumstances of issuance; 5) relationship between amount borrowed and size of borrower's business; and 6) intended use of the funds. Since the loan agreement in *Great Western* was carefully tailored to the bank's requirements, placing extensive restrictions on the use of the loan proceeds and the conduct of the financial operation, the court held that the loan was not "risk capital" but was simply a commercial loan subject to the hazards normally incident to such transactions. A concurring opinion focused on the absence of any indication in the legislative history of the securities laws that Congress intended to include commercial financing within their protection. Noting that commercial bank lending is unrelated to the abuses associated with investing that Congress intended to eliminate through the Exchange Act, the concurrence concluded that the federal securities statutes were inapposite to notes received by a bank in an exercise of its lending function. 532 F.2d at 1260–1262. *See also Movielab, Inc. v. Berkey Photo, Inc.*, 321 F.Supp. 806, 808–09 (S.D.N.Y.1970), *aff'd*, 452 F.2d 662 (2d Cir. 1971).

Measuring the transaction in the present case against the risk capital criteria, we conclude that the participation agreement does not evidence an "investment" within the meaning of *Howey-Forman*. Indeed, the Bank's own nomenclature reveals that it did not consider its participation as an investment. On that score, the name assigned to the transaction by the parties, although not dispositive, is relevant in determining security status. *Forman*, 421 U.S. at 850, 95 S.Ct. at 2059. Throughout the transaction it is clear that the Bank regarded its participation as a loan, rather than an investment. The document which Irvine submitted to the Bank's Executive Committee reporting the Participation Agreement was entitled "Line of Credit Approved or Disapproved." Sundry other Bank memos confirm this characterization, referring to the "lending" involved and the Bank's prior lending to Donalds as "direct," implying that the loan participation was merely an "indirect" loan of the same nature. There is no indication in the record that the Bank distinguishes between participatory and direct loans, and the Bank's participation with CCBL in the extension of credit to Donalds was apparently approved by the same officials who normally pass on direct loans. William Acker, the Bank's expert concerning industry standards in connection with loan participations, referred many times in his testimony to CCBL as the "primary lender" in the loan. These factors confirm the parties perception of the participation as nothing more than a routine commercial loan.

The *Great Western* test first examines the time frame in which the funds are retained by the borrower; the longer the money is held, the more probable it becomes that an investment is involved. *Great Western, supra*, at 1257–58. Here, the Secured Term Loan Agreement provided that Donalds would commence repayment of the loan amounts almost immediately, and would have the entire balance paid off by November 30, 1978. More importantly, the full amount of any advances were collateralized by Donalds' accounts receivable. The loan apparently had sufficient collateral when executed, and the Bank never sought to investigate or appraise the adequacy of the accounts receivable. The existence of collateral is strongly suggestive of a commercial loan. *See FBS, supra* at 93,156.

The additional factors also counsel against finding an "investment." There was no public offering and there is no indication that the participation interest was "procured for speculation or investment." *See McClure v. First National Bank*, 497 F.2d 490, 493 (5th Cir. 1974), *cert. denied*, 420 U.S. 930, 95 S.Ct. 1132, 43 L.Ed.2d 402

subject. *See e. g.* FitzGibbon, *What is a Security?—A Redefinition Based on Eligibility to Participate in the Financial Markets*, 64 Minn.L. Rev. 893 (1980) (proposing as the definition of security "a financial instrument eligible to participate in a public market" based upon the history of the securities legislation and mechanics of the markets). *Id.* at 919.

(1975); *Lino v. City Investing Co.*, 487 F.2d 689, 694–95 (3rd Cir. 1973). The Bank was well aware that the loan proceeds were to be used to finance Donald's current operations instead of serving as risk capital to obtain new productive assets. Although the Bank insists that because of CCBL's control over the loan, it (the Bank) was no more than a passive investor, we feel that the *Great Western* factors militate against finding an investment here.

## COMMON VENTURE

■ The second prong of the *Howey-Forman* test looks for the existence of a "common venture." While the trial judge characterized the loan syndication as a "joint venture," the Bank urges that the facts here support a finding of a common venture, without offering any insight as to the distinction between the two terms. In considering whether a given relationship between parties to a transaction satisfies the common venture element for a security, the courts have identified two types of alliances: vertical and horizontal. *See* Note, *Liabilities of Lead Banks in Syndicated Loans under the Securities Acts*, 58 B.U.L. Rev. 45, 56–58 (1978). A common enterprise involving vertical commonality is one in which the fortunes of the investor are interwoven with and dependent upon the efforts and success of those seeking the investment of third parties. *See SEC v. Continental Commodities Corp.*, 497 F.2d 516, 521–22 (5th Cir. 1974); *SEC v. Glenn W. Turner Enterprises, Inc.*, 474 F.2d 476, 482 n.7 (9th Cir. 1973). It requires only that the investor and promoter be involved in some common venture without requiring the involvement of other investors. *Brodt v. Bache & Co., Inc.*, 595 F.2d 459, 461 (9th Cir. 1980). A vertical relationship is best illustrated by a one-on-one arrangement between a lender and a customer. A horizontal common enterprise, on the other hand,

requires a heightened degree of affiliation. Horizontal commonality ties the fortunes of each investor in a pool of investors to the success of the overall venture. *See Milnarik v. M–S Commodities, Inc.*, 457 F.2d 274, 278 (7th Cir.) *cert. denied*, 409 U.S. 887, 93 S.Ct. 113, 34 L.Ed.2d 144 (1972).[11] In fact, a finding of horizontal commonality requires a sharing or pooling of funds. *See Hirk v. Agri-Research Council, Inc.*, 561 F.2d 96, 101 (7th Cir. 1977).

This circuit selected its approach in *Curran v. Merrill Lynch, Pierce, Fenner and Smith*, 622 F.2d 216 (6th Cir. 1980), *cert. granted*, —— U.S. ——, 101 S.Ct. 1971, 68 L.Ed.2d 293 (1981). In deciding that a discretionary trading account was not a security, Judge Engel noted that a requirement of horizontal commonality best comported with the language of *Howey*, because in a common enterprise all investors must share a common fortune. *Id.* at 222. The relationship in *Curran* was entered into solely between the plaintiff as an investor and Merrill Lynch as broker. To find a common enterprise in that relationship—where a principal has entrusted funds to an agent— the court noted, would effectively excise that requirement from the *Howey-Forman* test.

Under the facts of the present case we have little difficulty recognizing a common enterprise. The fortunes of the Bank and CCBL as lenders in this transaction were inextricably intertwined. The loan shares of the Bank and CCBL were not unitary in nature; the success or failure of each was not without regard to the other. The profits or losses flowed uniformly to each. As a result, when Donalds entered bankruptcy, the proceeds from collection of the accounts receivable were channelled pro rata, on a 50–50 basis, to the Bank and CCBL. On the whole, then, the Bank and CCBL were engaged in a common venture to loan money to Donalds.

---

11. In *Milnarik*, unrelated discretionary commodities accounts were all managed by the same commodities broker. Since the accounts were not connected and were not managed similarly, the success or failure of one account had no effect on the status of the other accounts. Each investor received profits from the sale of commodities in his own account, rather than a share of the aggregate profits that the diverse accounts generated collectively. 457 F.2d at 276–77.

## REASONABLE EXPECTATION
## OF PROFITS

■ The Participation Agreement provided that the Bank would be repaid the amounts of principal advanced plus a fixed rate of interest. The Bank argues that "the fact that the profits of the Bank reasonably expected to receive from its investment were interest earnings does not in any way diminish the investment nature of the contract." To support this contention, the Bank cites *MacKethan v. Peat, Marwick, Mitchell & Co.*, 1978 Fed.Sec.L.Rep. (CCH) Par. 96,342 (E.D.Va.1977), for the proposition that the Securities Acts encompass debt as well as equity instruments. While it is true that the Securities Acts may regulate certain debt instruments which offer fixed rates of return, *see El Khadem v. Equity Sec. Corp.*, 494 F.2d 1224, 1229 (9th Cir.), *cert. denied*, 419 U.S. 900, 95 S.Ct. 183, 42 L.Ed.2d 146 (1974), that generalized observation does not establish that the interest earnings realized by the Bank constitute "profits" within the meaning of the *Howey-Forman* test. A review of the Supreme Court's treatment of the expression "profits" convinces us they do not.[12]

In *Tcherepnin v. Knight, supra,* the Court held that nonnegotiable, withdrawable capital shares in a savings and loan association were securities within the meaning of section 3(a)(10) of the 1934 Act. The Court applied the *Howey* test, found its requirements satisfied and concluded that the shares had the "essential attributes of investment contracts" as that term was used in the Act and defined in *Howey*. A key "essential attribute" was the possibility of appreciation in the value of the investment. The holders of the withdrawable shares were not entitled to a fixed rate of return. Rather, they received dividends declared by the association's board and based on the association's profits. Prospective "profits" in the form of dividends were uncertain; they were a function of the profits of the association, which were in turn tied to the managerial skills of the business.

The focus on an expectation of appreciation in the value of an investment, or a variable rate of return, was reinforced by *Forman*. The plaintiffs in *Forman* sought the protection of the federal securities laws with respect to nontransferable, nonpledgeable "stock" in a nonprofit enterprise that they had purchased for the purpose of ensuring their right to rent certain low-cost apartments. The Court rejected the contention that the shares were "stock" as that term is used in the Acts, since the interests did not include either the most common feature of stock: the right to receive dividends contingent upon an apportionment of profits, or other attributes such as voting rights and negotiability, 421 U.S. at 851, 95 S.Ct. at 2060. The Court then considered whether the interests were investment contracts, analyzing carefully the "profits" element of the *Howey* test. The Court held that this element of the test was not satisfied and consequently the interests involved were not investment contracts. The key characteristic lacking was the possibility of appreciation; the shares could not appreciate in value since they were subject to a buy back agreement whereby the housing cooperative could repurchase the shares at the tenant's original cost. The Court expanded on its concept of "profits":

> By profits, the Court has meant either capital appreciation resulting from the development of the initial investment . . . or a participation in earnings resulting from the use of investors' funds . . . . In such cases the investor is "attracted solely by the prospect of a return" on his investment. *Howey, supra*, 328 U.S. at 300, 66 S.Ct. at 1103. By contract, when a purchaser is motivated by a desire to use or consume the item purchased . . . the securities laws do not apply. 421 U.S. at 852–53, 95 S.Ct. at 2060–61.

---

12. While profits in the form of a fixed rate of return are no less profits as envisioned by the literal understanding of the term, we agree with Judge Learned Hand that "it is one of surest indexes of a mature and developed jurisprudence not to make a fortress out of the dictionary. . . ." *Cabell v. Markham*, 148 F.2d 737, 739 (2d Cir.), *aff'd* 326 U.S. 404, 66 S.Ct. 193, 90 L.Ed. 165 (1945).

In the present case it is undisputed that the Bank had no expectation of capital appreciation; on the contrary, the return expected by the Bank was simply the repayment of the amounts advanced plus a fixed rate of interest. The rate of return the Bank could expect was fixed in the Participation Agreement at the prevailing prime rate plus two points. These interest payments were not contingent. Indeed, CCBL held back 15% of the loan amounts to insure payment. The adequacy of the interest fund was never disputed by the Bank during the life of the loan and the Bank received the full interest to which it was entitled prior to Donald's collapse. Under the terms of the Participation Agreement, no higher rate of return was possible. The profit which would accrue to the Bank in the form of interest earnings was contingent only upon the passage of time, and was not of a different nature than in a commercial lending transaction. Accordingly, the Bank had no reasonable expectation of profit as that term is used in the *Howey-Forman* securities context.

## PROFITS DERIVED FROM THE EFFORTS OF OTHERS

The final element of the *Howey-Forman* test requires that the profits be derived from the "managerial or entrepreneurial efforts of others." In its brief the Bank argues that its "receipt of interest income was dependent entirely upon the success of CCBL's efforts to successfully manage Donald's financing and keep them in business." We reject the Bank's argument that the final phase of the test refers to the efforts of CCBL, the lead lender. Although CCBL was clearly responsible for performing certain administrative tasks, those services are not managerial or entrepreneurial within the meaning of the *Howey-Forman* test. The interest income which was to be paid to the Bank and CCBL was to be derived from the efforts of Donalds in retailing furniture. These efforts, in the long run, were unsuccessful and eventually resulted in bankruptcy, but they were not the efforts of CCBL and therefore the legal test of *Howey-Forman* has not been satisfied.

This result is consistent with the conclusion reached by the majority of federal courts which have considered the issue. For example, in *FBS Financial, supra,* where the court held that a loan subparticipation was not a security, the lead lender had sole responsibility for servicing and administering the loan on behalf of five loan participants. The court noted that centering this responsibility in one lender was indigenous to a loan participation, since efficient administration would be impossible if management were decentralized among all the participants. The necessary concentration of management services in the lead lender, however, did not render those services "entrepreneurial" as required by *Howey* and *Forman.* Admittedly, the lead lender was responsible for monitoring to completion the construction of an office building which would produce the interest income, but that interest income was not "derived from" the efforts of the lead lender whose managerial efforts were certainly not entrepreneurial. This analysis applies with equal force here. The responsibilities undertaken by CCBL were routine, loan monitoring tasks. Although CCBL supervised the loan, policed the collateral, and collected interest and principal payments, its efforts were not managerial or entrepreneurial in the sense that they generated the return expected by the parties.

■ In sum, the Bank's attempt to classify the loan participation as a security under the facts present here must fail. The securities laws are not a panacea for commercial loans gone awry. Relief from the consequences of commercial transactions unwisely contracted must be found in another haven. *See Amfac Mortgage Corp. v. Arizona Mall of Tempe,* 583 F.2d 426, 428 (9th Cir. 1978). The decision of the district court that the loan participation interest purchased by the Bank does not constitute a security is affirmed.

## IV.

In addition to the federal securities claim, the Bank sought to recover for misrepresen-

tations by CCBL which induced the execution of the amendment to the Participation Agreement under the Tennessee common law of fraud.[13] In the second Special Verdict, the jury found CCBL guilty of commercial fraud under Tennessee law based upon a negligent misrepresentation concerning the credit-worthiness of Donald's accounts receivable in connection with the execution of the amendment to the Participation Agreement. The third Special Verdict answer, however, found the Bank guilty of contributory fault which proximately caused its injury.[14] Under Tennessee law, contributory negligence is a defense to claims of fraud based upon negligent misrepresentation. Accordingly, the trial judge entered judgment for CCBL on this issue.

In a post-trial motion to alter or amend the judgment on Tennessee common law fraud, the Bank argued that because a finding of intentional fraud was inherent in the jury's answer to Special Verdict No. 1, the contributory fault verdict was precluded even though Tennessee law differed from federal law by recognizing negligent fraud. The district judge denied that motion.

With a subtle but significant shift in analysis, the Bank now argues that the "trial court's refusal to enter judgment for the Bank on common law fraud was premised upon a refusal to acknowledge that Tennessee law recognizes two separate and different causes of action for fraud." The Bank asserts that the two types of

fraud which must be distinguished are intentional fraud and negligent fraud. The latter is based on negligent misrepresentation,[15] while the former is predicated upon knowing or reckless conduct, comparable to a federal securities law fraud claim pursuant to section 10(b) and Rule 10b–5.[16]

CCBL does not contest the existence of a Tennessee action for intentional fraud, but rather argues that the Bank never presented this claim at trial, never requested any jury instructions on this theory, and cannot through some sleight of hand interpolate the jury's findings on the federal count to a state count raised for the first time on appeal.

In its brief the Bank concedes that the jury's finding of contributory negligence bars recovery on the theory of negligent fraud, but argues that the jury's finding that CCBL knowingly or recklessly violated the federal securities acts requires recovery on intentional fraud as well. Thus, the Bank seeks to attach a collateral estoppel effect to the jury's finding of knowing or reckless conduct by CCBL in connection with the federal fraud claim; it seeks to use the factual findings of Special Verdict No. 1 to support a judgment for itself on common law intentional fraud. This is required, the Bank argues, because the elements of Tennessee intentional fraud are inherent in the federal sec. 10(b)/10b–5 claim,[17] allowing factual findings to be transposed from the federal count to the state count, so that the

---

**13.** The jurisdictional basis for these claims was diversity of citizenship, not pendent jurisdiction. *See Mansbach v. Prescott, Ball & Turben,* 598 F.2d 1017, 1022 n.9 (6th Cir. 1979).

**14.** In ruling on the post-trial motions, Judge McRae reinforced this finding, characterizing the Bank's handling of the loan participation as "gross ineptness".

**15.** *See Guilbert v. Phillips Petroleum Co.,* 503 F.2d 587, 591 (6th Cir. 1974).

**16.** *See Graham v. First American National Bank,* 594 S.W.2d 723, 725 (Tenn.App.1979).

**17.** In *Mansbach, supra,* we observed that "[t]he Sec. 10b/10b–5 claim is not identical to common law fraud, *see James v. Gerber Products Co.,* 483 F.2d 944, 946 (6th Cir. 1973) ..." 598

F.2d at 1024. There are substantial similarities, however, between certain elements of the two actions. In *Mansbach* we delineated the elements of a federal securities fraud claim as 1) the use of jurisdictional means 2) to implement a deceptive or manipulative practice (with the requisite scienter) 3) in connection with 4) the purchase or sale 5) of a security 6) causing 7) damages. 598 F.2d at 1026.

In *Edwards v. Travelers Insurance of Hartford, Conn.,* 563 F.2d 105 (6th Cir. 1977), we capsulized the elements necessary to sustain an action for intentional fraud under Tennessee law: 1) a false representation 2) of an existing or past material fact 3) made knowingly or without belief in its truth or recklessly (with scienter) 4) which induces reasonable reliance 5) resulting in damages. 563 F.2d at 110–113.

court can determine the appropriate judgment to be entered on the special verdict's answer.[18] To support its position, the Bank cites *Solomon v. United States*, 276 F.2d 669, 676 (6th Cir.), *cert. denied*, 364 U.S. 890, 81 S.Ct. 219, 5 L.Ed.2d 186 (1960). There the jury returned separate verdicts against four defendants in a conspiracy case. The defendants argued that separate verdicts were inconsistent with the law of conspiracy where liability is joint and several. This court rejected that contention, noting that under FRCP 49(a) the trial judge is authorized to submit special findings of fact to the jury which might be made under the pleadings and evidence. The jury's findings, in the form of special verdicts, the court went on, are merely factual findings to which the judge must then apply appropriate legal principles.[19] Therefore, the judge could enter verdicts for joint and several liability since the jury had found the facts necessary to convict each defendant.

With the wisdom of *Solomon*, the judge must apply appropriate legal principles to the factual findings returned by the jury, here reflected in the answers to the Special Verdicts. The district judge did just that in granting JNOV on the federal securities claim. Although the jury had returned the requisite factual findings to support a verdict for the Bank, only the trial judge could rule on the threshold legal issue, namely, the existence of a security. His ruling that the loan participation was not a security thereby eclipsed the jury's answer to Special Verdict No. 1, requiring a judgment for the defendant.

Our review of the record convinces us that the trial judge did not enter judgment for the Bank on intentional fraud under Tennessee law because the Bank never asserted a claim based on this cause of action. Conspicuously absent from the Bank's complaint is any reference to intentional fraud

under Tennessee law. Indeed, the only reference to any common law claim is the cryptic notation in the complaint that "The Court has jurisdiction of all other claims made herein pursuant to the principal of pendent jurisdiction and ... the parties are of diverse citizenship." Regarding the defendant's misrepresentations and omissions, the only allegation is that such conduct constituted a Sec. 10b/10b–5 violation. All other assertions in the complaint concern CCBL's alleged negligence in the administration of the loan leading to the amendment of the participation agreement. Even a liberal reading of the complaint fails to hint at an assertion of a common law intentional fraud claim.

The district court's pre-trial order reflects this perception. That order characterized the Bank's contentions as two-fold: an allegation that CCBL's conduct made out a Sec. 10b/10b–5 violation, and an allegation that CCBL's conduct amounted to fraud under Tennessee common law, the elements of which were 1) untrue statements or omissions of facts; 2) reliance; 3) materiality. These are the elements of negligent fraud, not intentional fraud. That the district court's perceptions were accurate was confirmed by the Bank's special requests for jury instructions. The only requests regarding common law fraud, Nos. 25 and 26, concerned negligent misrepresentations. Accordingly, the jury did not receive a special verdict regarding intentional fraud.

Several factors convince us that the Bank's failure to raise intentional fraud at trial precludes it from raising that claim now. It is axiomatic that an issue not presented to the trial court cannot be raised for the first time on appeal. *Bannert v. American Can Co.*, 525 F.2d 104, 111 (6th Cir. 1975); *Schneider v. Electric Auto Lite Co.*, 456 F.2d 366, 375 (6th Cir. 1972). *See also McMillan v. Marine Sulphur Shipping*

---

18. This position assumes, of course, that the district judge abused his discretion in ordering a new trial. In light of our conclusion that the Bank is prohibited from raising the claim of intentional fraud on appeal, we need not review the conditional grant of a new trial.

19. To be sure, special verdicts are concerned only with issues of fact, not issues of law. *See e. g. Dual Mfg. & Eng. v. Burris Industries*, 619 F.2d 660, 667 & n.6 (7th Cir.) (en banc), *cert. denied*, 449 U.S. 870, 101 S.Ct. 208, 66 L.Ed.2d 90 (1980).

*Corp.*, 607 F.2d 1034, 1038 & n.8 (2d Cir. 1979), *cert. denied*, 445 U.S. 905, 100 S.Ct. 1082, 63 L.Ed.2d 321 (1980); *Johnston v. Holiday Inns, Inc.*, 595 F.2d 890, 894 (1st Cir. 1979).

This general rule is consistent with the finality accorded the pre-trial order. Pretrial orders are designed to expedite litigation and eliminate surprise by framing the issues remaining for trial. The Bank does not contend that the pretrial order here was improperly drawn, and we see no problems with it. Even under a liberal construction, that order does not embrace the theory now articulated by the Bank. Under Fed.Rule Civ.Pro. 16 the pre-trial order controls the subsequent course of the proceedings and becomes the governing pattern of the lawsuit. *Management Investors v. United Mine Workers*, 610 F.2d 384, 390 n.17 (6th Cir. 1979). Since the defendant had no meaningful opportunity to argue the issue in the district court, the judge appropriately chose not to rule on the issue of intentional fraud. *See Seymour v. Coughlin Co.*, 609 F.2d 346, 348 (9th Cir. 1979).

Finally, the Bank's failure to seek proper jury instructions based upon Tennessee Law, forecloses it from now raising the claim. When a state-created right is being asserted, the state law must be looked to for the substance of the instruction. *Lones v. Detroit, Toledo and Ironton Railroad Company*, 398 F.2d 914, 920 (6th Cir.), *cert. denied*, 393 U.S. 1063, 89 S.Ct. 714, 21 L.Ed.2d 705 (1968). Had the Bank argued fraudulent misrepresentation under Tennessee law at trial, CCBL would have been entitled to certain jury instructions based upon Tennessee law.

CCBL argues that the waiver provision of Fed.R.Civ.Pro. 49(a) precludes our consideration of the Bank's claim. Under Rule 49(a), the failure of a party to request the court to submit any issue to the jury which the court might have overlooked is a waiver of that claim by the party. In the present case the Bank did not submit any special verdict questions relevant to the issue of common law intentional fraud. Rather, the instructions proffered by the Bank related solely to negligent fraud.

We find the waiver provision of dubious applicability here. The waiver provision of Rule 49(a) only applies, when, in submitting the issues to the jury, the court "omits any issue of fact raised by the pleadings or by the evidence." *See General Beverage Sales Co. v. East Side Winery*, 568 F.2d 1147, 1155 (7th Cir. 1978). Since the issue of common law intentional fraud was never raised by the pleadings or by the evidence, it could not be omitted from the special verdicts submitted for the jury's consideration.

The decision of the district court is affirmed.