NOT RECOMMENDED FOR PUBLICATION
File Name: 19a0432n.06

No. 18-5434

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
Aug 20, 2019
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| | ) | ON APPEAL FROM THE |
| v. | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE WESTERN |
| CLAY SHELTON, | ) | DISTRICT OF KENTUCKY |
| | ) | |
| Defendant-Appellant. | ) | |

BEFORE:    SUHRHEINRICH, CLAY, and DONALD, Circuit Judges.

SUHRHEINRICH, Circuit Judge.   Clay Shelton sold $1,370,000 in securities with the promise that the investment would be used to purchase a natural gas pipeline in Tennessee. Instead, he used the money to purchase collateralized mortgage obligations, make payroll at one of his companies, and pay himself a salary.  As a result, he was convicted of wire fraud, money laundering, and securities fraud.  On appeal, he claims that there was insufficient evidence to support his convictions.  He also asserts that he received ineffective assistance of counsel at trial. We **AFFIRM** his convictions and **DENY** his ineffective assistance claims.

## I.    FACTS

In 2011, Shelton formed Escrow 2011, LP ("Escrow 2011").  His goal was to use Escrow 2011 to solicit investments to fund an escrow account.  Shelton said that escrow account would be used to secure financing to purchase and operate the existing Monterey Pipeline gas pipeline in

Tennessee. Shelton provided the following two documents to his investors, many of whom had invested with Shelton in a previously-failed venture in 2007.

*Escrow 2011 Quick Summary.* Shelton drafted a one-page document titled "Escrow 2011, LP Quick Summary" ("Quick Summary"). Every investor received this document. The Quick Summary explained that the purpose of Escrow 2011 was "to fund an escrow account in order to complete the financing for the acquisition of an existing pipeline company in Tennessee." According to the Quick Summary, Escrow 2011 would comprise of 30 units sold at $50,000 each, for a total of $1,500,000 to be put into an escrow account. Once the escrow account reached $1,500,000, then an unnamed bank would give Escrow 2011 $15,000,000 in financing to complete the pipeline acquisition. The Quick Summary states that "[o]nce the financing is completed and the monies have been received into the designated account of the pipeline company, the escrow will be released and returned to the investors in full." Investors would also receive either a 25% return on their investment or a refund of previously-failed investments with Shelton's company, U.S. Energy Partners, Inc.

*The Private Placement Memorandum.* Shelton also prepared a longer document called the "Private Placement Memorandum" ("PPM"). The PPM described similar basic terms: 30 units at $50,000 per unit to purchase the Monterey Pipeline. Throughout the PPM, these units are extensively referred to as "securities." The PPM described different outcomes for the money. One paragraph stated that "[t]here is no minimum offering amount and funds will not be held in an escrow account." Another paragraph stated that "[p]ayments for all Units will be received by the Managing General Partner [U.S. Energy] and deposited in an offering account at American Bank & Trust, Bowling Green, Kentucky." Some investors saw the PPM before investing, some did not see it until after they invested, and some never saw it at all.

Notably, the Quick Summary does not reference the PPM.

Between March 3, 2011 and September 24, 2012, out-of-state investors gave Shelton a total of $1,370,000 that was deposited into two separate bank accounts at American Bank & Trust ("AB&T") in Bowling Green, Kentucky. Neither account was an escrow account. Shelton never used this money to secure financing for the pipeline because the money did not stay at AB&T for long. Between August 17, 2011 and September 7, 2011, Shelton wired $1,000,000 to a Texas bank account belonging to attorney Jay Mac Rust, so Rust could invest the money in collateralized mortgage obligations. Between September 22, 2011 and September 7, 2012, Shelton also took $124,000 from the Escrow 2011 account and transferred it directly to his U.S. Energy account to pay for payroll, business expenses, and his own salary.

Shelton was convicted of three counts of wire fraud in violation of 18 U.S.C. § 1343; four counts of money laundering in violation of 18 U.S.C. § 1957; and 17 counts of securities fraud in violation of 15 U.S.C. §§ 78j(b), 78ff, and 17 C.F.R. §240.10-b5. He was sentenced to 50 months in prison and ordered to pay $1,075,000 in restitution.

Shelton appeals, asserting that the government failed to prove that (1) he had fraudulent intent when receiving investments; (2) two investors relied on his misrepresentations; and (3) the investments meet the legal definition of "security." Shelton also asserts that he received ineffective assistance of counsel at trial.

## II.    STANDARD OF REVIEW

On review for sufficiency of the evidence, we must view the evidence in the light most favorable to the prosecution and determine whether "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307,

319 (1979). We may "uphold a conviction based on circumstantial evidence alone." *United States v. Brown*, 888 F.3d 829, 832–33 (6th Cir. 2018) (citations omitted).

## III.    ANALYSIS

### 1. Fraudulent Intent

Wire fraud, money laundering, and securities fraud all require proof of fraudulent intent. *See, e.g.*, *United States v. Daniel*, 329 F.3d 480, 485 (6th Cir. 2003) ("To convict a defendant of wire fraud, the government must prove . . . intent to deprive a victim of money or property.") (internal quotations and citation omitted); *United States v. DeSantis*, 134 F.3d 760, 764 (6th Cir. 1998) (explaining that securities fraud, like mail fraud, requires proof of specific intent to defraud); 18 U.S.C. § 1957(a) (explaining that money laundering occurs when a person "*knowingly* engages or attempts to engage in a monetary transaction in criminally derived property of a value greater than $10,000 and is derived from specified unlawful activity.") (emphasis added). Shelton asserts that the government did not meet its burden to prove that he had fraudulent intent when soliciting investments for Escrow 2011. We disagree.

At the start of Escrow 2011, Shelton represented to his investors that their money would be placed—and remain—in escrow. Indeed, the very name of the venture plainly evinces as much. The Quick Summary says that entire purpose of Escrow 2011 was to fund an escrow account. Multiple investors testified that Shelton personally represented to them that their money would be held in escrow pending approval of the financing. And Shelton's employee Aaron Grogan testified "that the money in the escrow would be in the escrow until the 15 million was secured, and once that part of it was done, just as it says, the escrow would be released and returned to the investors." Yet the money never went into escrow, so the jury had evidence of Shelton's fraudulent intent from the outset.

Additionally, the jury was not limited to Shelton's initial representations; it could also "infer fraudulent intent from a defendant's 'efforts to conceal the unlawful activity[.]'" *United States v. Maddux*, 917 F.3d 437, 446 (6th Cir. 2019) (alteration in original) (quoting *United States v. Smith*, 749 F.3d 465, 478 (6th Cir. 2014)). Shelton took the money out of the AB&T account almost immediately after it came in and used it for his own purposes. This included $1,000,000 sent to Jay Mac Rust between late August and early September 2011. Yet the PPM stated that the offering would remain open until December 31, 2011, so Shelton was already taking money out to invest it before his own offering period had expired. And when investors asked Shelton about their money, Shelton assured them the money was still in the escrow account. One investor testified that he spoke to Shelton on the phone and "repeatedly asked for proof that the escrow account actually existed and that it was adequately funded" but that Shelton gave him "one excuse after the other."

In summary, Shelton told investors that their money would go into escrow and stay there, but he never put it into an escrow account. He promised to hold the offering open until December 31, 2011, but by then he had already put $1,000,000 into collateralized mortgage obligations. And when investors inquired about their funds, Shelton was evasive. Taken in the light most favorable to the prosecution, a reasonable jury could find that Shelton had fraudulent intent from the very beginning of Escrow 2011.

### 2. Misrepresentations "In Connection With" an Investment

Rule 10b-5[1] makes it unlawful for a person to (1) "employ any device, scheme, or artifice to defraud," (2) "make any untrue statement of a material fact or to omit to state a material fact," or (3) "engage in any act, practice, or course of business which operates or would operate as a

---

[1] Rule 10b-5 is coextensive with § 10(b) of the Securities Exchange Act. *S.E.C. v. Zandford*, 535 U.S. 813, 816 n.1 (2002).

fraud or deceit upon any person," that is done "*in connection with* the purchase or sale of any security." 17 C.F.R. § 240.10b-5 (emphasis added).

Regarding the "in connection with" element, the district court explained in its jury instructions that the government had to prove beyond a reasonable doubt "that there were purchases or sales of securities and that the fraud or deceit . . . had some relationship to or was connected with these sales or purchases." *See also Chadbourne & Parke LLP v. Troice*, 571 U.S. 377, 387 (2014) (internal quotations omitted) (explaining that to be made "in connection with" the sale of a security, the misrepresentation must be "material to a decision by one or more individuals (other than the fraudster) to buy or to sell a covered security"). Further, the district court explained in its jury instructions regarding materiality that "the government must prove beyond a reasonable doubt that the fact misstated or the fact omitted was of such importance that it could reasonably be expected to cause or to induce a person to act or invest or to cause or induce a person not to act or invest." *See also TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976) (explaining that a fact is material if there is a substantial likelihood that a reasonable investor would consider it important in making an investment decision).

Shelton claims that the government failed to provide sufficient evidence that Shelton's alleged misrepresentations were material to the decision to purchase the securities in Counts 11, 25, and 26 because the investors from those counts did not testify. Therefore, according to Shelton, there was no proof as to what information was material to the investors.

Count 11 related to a $50,000 investment on August 10, 2011 by Charles Dinger. Dinger was deceased by the time Shelton was tried, but his son, Joshua, testified that he was "aware that in 2011 [his] father made some investments." Joshua Dinger also testified that he found emails between his father and Grogan. Those emails included the Quick Summary, the PPM, and another

email from Grogan stating "[o]nce the main funds hit the account, then the funds paid into the escrow plus the interest payment will be paid to the investors."

Counts 25 and 26 related to investments made by Mills Tuttle. Tuttle died before Shelton was tried. Another investor, Curtis Schwarzrock, testified that he introduced Tuttle to Shelton. Schwarzrock testified that Tuttle invested with Shelton in 2007 and again in 2011 for Escrow 2011. Grogan testified that he sent the Quick Summary to the Tuttle. There was no evidence that Tuttle received the PPM, or that Grogan or Shelton had any separate communications with Tuttle.

Shelton argues that because Dinger and Tuttle did not testify, the jury could not determine which representations, if any, were essential to their decision to invest. We disagree. The government presented evidence that Dinger and Tuttle both received the Quick Summary. The Quick Summary represents that a funded escrow account would "complete the financing"—suggesting that financing was already approved—and that the money would remain in escrow in the meantime. Taken together, and in the light most favorable to the prosecution, a jury could determine that these misrepresentations were material and connected to Dinger's and Tuttle's decisions to invest.

### 3. The Definition of "Security"

Shelton also challenges his securities fraud convictions by claiming that investments in Escrow 2011 were not securities but instead "risky loans." Shelton did not raise this claim before the district court, so we review for plain error. *See United States v. Ramer*, 883 F.3d 659, 682 (6th Cir. 2018). Thus, Shelton must show that "(1) an error occurred; (2) the error was obvious or clear; (3) the error affected his substantial rights; and (4) the error seriously affected the fairness, integrity, or public reputation of the judicial proceedings." *United States v. Bacon*, 884 F.3d 605, 611 (6th Cir. 2018) (citation omitted).

"Security" is defined in the Securities Act of 1933 and the Securities Exchange Act of 1934. *See* 15 U.S.C. §§ 77b, 78c. However, courts generally "reject[] a literal application" of these definitions and instead focus on the "economic realities" of the transaction at issue by applying the *Howey-Forman* test.[2] *Am. Bank & Tr. Co. v. Wallace*, 702 F.2d 93, 95–96 (6th Cir. 1983). Under the *Howey-Forman* test, a security is "[1] the presence of an investment [2] in a common venture [3] premised on a reasonable expectation of profits [4] to be derived from the entrepreneurial or managerial efforts of others." *United Hous. Found., Inc. v. Forman*, 421 U.S. 837, 852 (1975); *see also Am. Bank & Tr. Co.*, 702 F.2d at 96.

We do not need to dive deep to see that the jury had ample evidence to conclude that Shelton sold securities. As this Court has previously explained, "the name assigned to the transaction by the parties, although not dispositive, is relevant in determining security status." *Union Planters Nat'l. Bank of Memphis v. Commercial Credit Bus. Loans, Inc.*, 651 F.2d 1174, 1182 (6th Cir. 1981). Here, the PPM—which Shelton asserts "provided the exclusive terms governing Escrow 2011" —repeatedly calls the investments into Escrow 2011 "securities." In fact, "securities" are referenced 13 times on the very first page of the PPM and a total of 36 times throughout the document. For example, the very first sentence under the heading "Terms of the Offering" states: "The securities offered hereby are Investor General Partner interests and/or Limited Partner interests (the "Units") in Escrow 2011, L.P., a limited partnership formed June 30, 2011 under the laws of the Commonwealth of Kentucky (the "Partnership"). Another example: "This memorandum does not constitute an offer to sell or the solicitation of an offer to buy any securities other than the securities offered hereby." In short, there was no error, plain or otherwise, because the jury had ample evidence to conclude that Shelton sold securities.

---

[2] The *Howey-Forman* test comes from two Supreme Court cases: *S.E.C. v. W.J. Howey Co.*, 328 U.S. 293 (1946) and *United Housing Foundation, Inc. v. Forman*, 421 U.S. 837 (1975).

### 4. Ineffective Assistance of Counsel

Finally, Shelton claims his trial counsel was constitutionally ineffective for two reasons: failing to ask Grogan on cross examination if every investor received the PPM and failing to pursue a good faith jury instruction for the wire fraud charges. Although ineffective assistance claims are typically best resolved on a petition for collateral review under 28 U.S.C. § 2255, we can address these claims on direct appeal if the record is sufficiently developed to do so. *Massaro v. United States*, 538 U.S. 500, 508 (2003). Ineffective assistance claims require proof of deficient performance by counsel and prejudice to the defendant as a result. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Both of Shelton's claims fail.

*Cross-Examination of Grogan.* Trial counsel cross-examined the investors regarding the terms of the PPM even though multiple investors testified that they never signed it. After this happened several times, the district judge called a bench conference. The district judge asked trial counsel why he did not ask Grogan about receiving signed PPMs. Trial counsel responded "[w]ell, that's a question I didn't know the answer to, frankly." Trial counsel explained to the district judge that "from our end there is a complete lack of documents" because a fire burned down Shelton's business. As to whether the witnesses signed the PPMs, trial counsel told the district court that he did not "have any reason to think that they didn't receive signed documents" but that "[he did not] have a source to even go investigate on it." The prosecutor added that "[n]obody had a copy of an executed [PPM] back from Mr. Shelton which is pretty weird."

Shelton asserts that trial counsel should have cross-examined Grogan as to whether every investor signed the PPM. Shelton contends that the language in the PPM states that Escrow 2011 was a high-risk venture, so investors should have been aware that they could lose their money. Therefore, according to Shelton, had Grogan testified that each investor received and signed the

PPM, then those investors would have been impeached because they knew they entered into a risky venture.

Trial counsel's decision not to ask Grogan if he had received signed PPMs from the investors was neither deficient performance nor prejudicial. Trial counsel did not know the answer to the question that Shelton wanted to ask. This Court has previously found trial counsel's decision to entirely refrain from cross-examining a witness "virtually unchallengeable" because, in trial counsel's strategic view, it "would simply focus additional attention" on unfavorable testimony. *Moss v. Hofbauer*, 286 F.3d 851, 864 (6th Cir. 2002) (citation omitted). The same is true here.

Additionally, to establish prejudice, Shelton needs to show that there was a reasonable probability that the outcome of his trial would have been different. *Strickland*, 466 U.S. at 694. He cannot do that because regardless of Grogan's answer, the outcome would have been the same. If Grogan had testified that the investors all signed the PPM, that testimony would not be dispositive because there were still inconsistencies between the PPM and the Quick Summary that the jury could construe against Shelton. *See Journey Acquisition–II, L.P. v. EQT Prod. Co.*, 830 F.3d 444, 455 (6th Cir. 2016). Alternatively, if Grogan had testified that the investors did not sign the PPM, then the Quick Summary would control. There is evidence in the record, consistent with the terms of the Quick Summary, that the investors believed their money would be held in escrow and remain untouched. Further, a repeat of the testimony that the investors never received the PPM would come with "the potential risk of having the damaging testimony repeated during cross-examination, a risk which could easily outweigh the possibility of identifying weaknesses in the witness's account." *Hofbauer*, 286 F.3d at 865. In short, trial counsel made a strategic decision not to ask Grogan about the PPMs because he did not know the answer. That decision did not render his representation constitutionally ineffective.

*Good Faith Jury Instruction.* Shelton also asserts that his trial counsel was constitutionally ineffective for failing to seek a good-faith jury instruction on the wire fraud charges. We disagree because Shelton was not prejudiced by the lack of the good-faith instruction. The district court gave a thorough instruction on the specific intent required for wire fraud when it explained to the jury that Shelton "denies . . . that the communications were made for the purpose of executing a scheme or to obtain money by false representations, pretenses, or promises, as alleged in Counts 1 through 3." Thus, the jury was adequately instructed on the government's burden to prove specific intent, so the failure to have a separate good-faith instruction was harmless error. *See United States v. McQuire*, 744 F.2d 1197, 1202 (6th Cir. 1984). Additionally, the district court gave the instruction that "an honest or good faith belief is absolutely inconsistent with a fraudulent intent" on the securities fraud charges. Although this instruction was not given specifically with respect to the wire fraud charges, the jury could have inferred the good-faith defense applied to those charges as well. And, at bottom, the government presented overwhelming evidence of Shelton's guilt. Therefore, Shelton was not prejudiced because the jury did not hear a good-faith instruction on the wire fraud charges.

## IV.    CONCLUSION

We **AFFIRM** Shelton's convictions and **DENY** his ineffective assistance claims.