OPINION AND ORDER
 

 O’MALLEY, District Judge.
 

 This action involves two separate cases that have been consolidated. Currently before the Court is defendants’ motion to dismiss the claims in the second of these, Case No. 94AJV-2403.
 

 In Case No. 94-CV-1267, plaintiff Realtek Industries, Inc. (“Realtek”) filed a complaint against defendants Nomura Securities International, Inc. (“Nomura Securities”) and Nomura Asset Capital Corporation (“Nomura Asset”) (collectively, “Nomura”). The complaint alleges that Realtek, which owns a number of multi-unit residential apartment buildings in several states, contracted with Nomura to help it refinance the mortgages on those buildings. The refinancing deal was never consummated, so Realtek claims that Nomura is liable to it for breach of contract, breach of fiduciary duty, misrepresentation, and related causes of action. Nomura responded with a counterclaim for breach of contract, unjust enrichment, and indemnification. Nomura also filed a third party complaint against Gilíes Stacker and his company, the Salamander International Corporation, (collectively, “Stacker”), seeking indemnification and contribution. Stacker, who served as a financial advisor to Realtek in relation to the proposed refinancing, then filed a third party counterclaim against Nomura for fraudulent and negligent misrepresentation and interference with contract.
 

 Realtek had various refinancing options available, including the possibility of issuing and selling mortgage bonds to investors. The refinancing scheme contemplated by Realtek and Nomura, however, was a more complex financing known as “structured financing” or “securitization.” This refinancing transaction involved the raising of funds by Nomura through the issuance of participation certificates, backed by mortgage notes on and lease income from Realtek’s properties. In Case No. 94-CV-2403, Realtek asserted claims under the securities laws against Nomura arising out of this structured financing. Specifically, Realtek asserted Nomura violated: (1) Section 10(b) of the Securities Exchange Act of 1934, and Rule 10b-5 thereunder; (2) Section 17(a) of the Securities Act of 1933; and (3) Ohio Rev.Code § 4165.01
 
 et seq.,
 
 Ohio’s Deceptive Trade Practices Act. Realtek amended its complaint before a responsive pleading was due. Nomura then moved to dismiss the amended complaint on the grounds that Realtek had failed to state a claim upon which relief could be granted under any of the legal theories asserted, and Realtek had failed to allege fraud with the particularity required by Rule
 
 *575
 
 9(b) of the Federal Rules of Civil Procedure. The two cases were consolidated shortly thereafter.
 

 This Court scheduled oral argument on the motion to dismiss the amended complaint. Before that argument, Realtek filed a second amended complaint in Case No. 94-CV-2403, dropping its claim under the Ohio Deceptive Trade Practices Act. During oral argument, the parties agreed that Nomura’s motion to dismiss the amended complaint would be construed as a motion to dismiss the second amended complaint, and Realtek explained that it did not intend to reassert a claim under Section 17(a) of the 1933 Act in its most recent complaint, thereby limiting the claims in that pleading to those asserted under Section 10(b) of the 1934 Act and Rule 10b-5 thereunder. The Court ruled from the bench that Realtek’s extensive and detailed Second Amended Complaint was sufficient to survive a motion to dismiss under Rule 9(b) and then heard argument on the legal sufficiency of the remaining securities law claims. The Court now rules that, for the reasons discussed below, Nomura’s motion to dismiss the second amended complaint is not well-taken. Accordingly, the motion to dismiss the second amended complaint in case number 94-CV-2403 (docket no. 13) is DENIED, and the federal securities law causes of action asserted in the sécond amended complaint shall remain a part of this ease.
 

 I.
 

 The pertinent allegations in the second amended complaint and attached exhibits
 
 [1]
 
 are as follows. Realtek owns a number of multi-unit residential apartment buildings in Michigan, Ohio, Florida, and Pennsylvania. In 1993, Realtek decided to refinance the mortgages on its properties in order to take advantage of favorable interest rates, which were then at a 20-year low. Realtek solicited refinancing bids from several commercial and investment banking institutions, including Nomura.
 

 Nomura discussed with Realtek its expertise in structuring financing deals for commercial properties. After a number of discussions, the parties agreed that Nomura would help refinance the Realtek properties through structured financing of about $165 million. The agreement was memorialized on October 20, 1993, in a document referred to by the parties as the “Commitment Letter.”
 

 In economic reality, this structured financing was designed to enable Realtek to raise $165 million from investors and to repay its existing, purportedly then-overpriced, mortgage loans. The basic outlines of this structured financing transaction were as follows. First the parties would establish an entity that would qualify as a “real estate mortgage investment conduit” (“REMIC”), which could provide investors pass-through tax treatment under the Internal Revenue Code. Realtek would then give to this REMIC entity mortgages on about 60 of its buildings, in exchange for the $165 million from Nomura. Realtek would execute mortgage notes promising to repay these loans, the notes to be cross-collateralized by the buddings. Realtek would assign to the REMIC entity the right to the lease incomes from the buildings, so that the monthly payments due under the mortgage notes could be paid out of the buddings’ income rental streams. The 60 mortgage notes would be pooled in order to create “certificates of undivided ownership,”
 
 *576
 
 also called “participation certificates.” Each participation certificate would represent an ownership share in the pool containing the 60 mortgage notes; with the ownership share would come the right to receive a proportionate share of the income rental streams, secured by the buildings as underlying collateral. The REMIC entity would then issue the participation certificates, which Nomura would sell to private investors.
 

 The result of this financing scheme was that the rental income streams from the 60 properties would “pass-through” the mortgage pool and REMIC to the private investors, who had bought the participation certificates, with beneficial “pass-through” tax treatment. The rental income streams would thus serve as a return on the investors’ payment of the certificate price. In turn, the money paid by the private investors for their certificates would “pass-through” the mortgage pool back to the original holder of the mortgage notes, Realtek. Realtek would then use the money generated by these investors to pay off its prior, existing mortgage loans. Nomura, meanwhile, would receive a fee for its role in the process.
 

 Grafted onto this general outline are details that made Nomura’s proposed refinancing deal much more complex.
 
 [2]
 
 First, the “participation certificates” were to be divided into five classes. Each class of participation certificate would be assigned a rating by at least one credit rating agency. The ratings for the first four classes would be AAA, AA, A, and BBB. Essentially, these four classes of certificates were distinguished by the priority of the certificate-holder’s claim to the properties’ stream of rental income. The fifth class of certificates, known as “R certificates,” would have entitled the owners only to the residual monies left after the holders of the first four classes of certificates were paid in full. Under the terms of the deal, Realtek, itself, was required to purchase the “R certificates,” ensuring that: (1) the structure would qualify as a REMIC; and (2) Realtek would have an incentive to secure continued and increased rental income from its properties.
 

 Second, the refinancing deal contemplated that Nomura would provide Realtek with “Interim Loans” for a period of about six months, secured by the mortgages and income streams on Realtek’s properties. The interest rate on the Interim Loans would float, changing monthly depending on a specified published interbank interest rate. The Interim Loans would presumably act as an advance on the monies Realtek anticipated through the structured financing. The parties do not dispute that Nomura never promised Realtek permanent “traditional” loans on its properties — if the structured financing was not successfully realized, Realtek would be obligated to repay Nomura for these interim advances.
 

 During the six month Interim Loan period, a process of due diligence was contemplated whereby Nomura would evaluate each of Realtek’s properties to determine whether it qualified to be included in the securitization process. Only those properties which met certain criteria, including acceptable appraisals, minimum levels of rental income, and adequate debt/equity ratios, could be refinanced through the “pass-through” structured financing. If a given property did not qualify, Realtek would simply pay off the Interim Loan on that particular property and seek permanent financing for it elsewhere. Qualified properties would eventually be financed through “Permanent Loans” with new terms, rates, and principal amounts. The Interim Loans would be paid off with these new loan amounts. The notes and mortgages related to the Permanent Loans would then go into the ultimate mortgage pool for securitization.
 

 Also during the due diligence period, one or more credit rating agencies were to be engaged to evaluate the finances underlying each qualified property. These evaluations were to be used by the credit rating agencies to determine the size of each class of rated certificates. The better Realtek’s operation
 
 *577
 
 of the properties, the larger Nomura’s ultimate offering of AAA-rated participation certificates, and the smaller Nomura’s offering of lower-rated certificates.
 

 The credit rating agency evaluations also had an impact upon the interest rate Realtek would pay on the Permanent Loans. Under the parties’ agreement, the credit rating agency evaluations and Realtek’s Permanent Loan interest rate were linked, or at least had the potential to be linked. Shortly after signing the Commitment Letter, Realtek was to decide whether it or Nomura would bear the “rating agency risk.” If Realtek decided that Nomura would bear the rating agency risk, then Realtek’s Permanent Loan interest rate would be determined simply by reference to a pre-determined financial table. Under this option, the interest rate Realtek would pay on the Permanent Loans would not depend in any direct way on the rating agencies’ assessments of the properties’ finances or operations, and the certificates issued by the REMIC entity would bear the rates specified in the financial table.
 

 Alternatively, Realtek could elect to retain the “rating agency risk.” Under this option, each of the first four of the five classes of participation certifieátes would be assigned an interest rate commensurate with its rating. The higher-rated classes of participation certificates would be assigned lower interest rates, and the lower-rated classes assigned higher interest rates. The total interest rate for the Permanent Loans would be calculated by taking a weighted average of the four interest rates, the weights being based on the size of each respective class. Thus, the better the credit rating agencies’ evaluation of Realtek’s operations, the larger would be the classes of higher-rated certificates, and thus the lower Realtek’s ultimate interest rate. As compared to the option under which Nomura bore the “rating agency risk,” Realtek would pay a lower overall interest rate on its debt if the rating agencies’ evaluations of its operations were sufficiently high. Realtek alleges that, between the two options, it elected to bear the rating agency risk in the hope of receiving high ratings on its properties from the credit rating agencies.
 

 The parties disagree on the impact Realtek’s assumption of the “rating agency risk” had on its status as a seller of securities. Nomura insists that
 
 regardless
 
 of which party bore the “rating agency risk,” Nomura would be the
 
 only
 
 party that, at any point during the entire process, sold securities— being the participation certificates issued by the REMIC entity as one of the last steps in the structured financing process. Realtek agrees that, regardless of which party bore the “rating agency risk,” the REMIC entity would ultimately issue participation certificates and Nomura would ultimately sell those certificates to investors. Realtek insists, however, that, because it was the holder of the mortgages, notes and leases to be transferred to the REMIC entity, if it chose to bear the “rating agency risk,” it would also be the indirect seller of the participation certificates to be issued by the REMIC entity. Specifically, Realtek alleges that, when it chose to bear this risk, it became obligated to issue
 
 and
 
 sell rated securities to the REMIC entity, and Nomura, as underwriter, would buy and resell the securities (possibly after repackaging) to investors. Realtek points to specific language in the exhibits to its second amended complaint to support its argument that Realtek, itself, was obligated to sell (and Nomura was obligated to buy and resell) securities under the “Realtek bears rating agency risk” option.
 

 What the parties agreed upon, including which party was to issue or sell securities, and to whom, and what Nomura’s status as seller or underwriter would be, are all questions of fact and cannot be resolved at this stage of the proceedings. In the context of this motion, the Court must accept each of Realtek’s allegations as true, unless it is obviously false or is a legal conclusion. Realtek alleges the parties agreed that Realtek would both issue and sell securities if it chose to bear the “rating agency risk,” and this factual allegation is not contradicted by the exhibits to the second amended complaint. Thus, the Court accepts Realtek’s allegation in determining whether Realtek states a claim for which relief can be granted.
 
 [3]
 

 
 *578
 
 Beyond the details described above, the parties also agreed that Realtek would pay certain of Nomura’s due diligence costs, such as legal fees, printing fees, property appraisals, and so on, and would pay Nomura a 2% underwriting fee, or about $3.3 million. Realtek alleges the parties also agreed that: (1) all of the proceeds of Nomura’s sale of participation certificates to the private investors, less specifically identified transaction costs, would go to Realtek, which would thereupon repay the Interim Loans; and (2) therefore, the overall interest rate earned by the investors would be equal to the interest rate on the Permanent Loans to be paid by Realtek.
 
 [4]
 

 Finally, Realtek alleges that Nomura breached dozens of promises included in their agreement. For example, Realtek alleges that Nomura did not meet certain deadlines, and knew it could not meet them when it agreed to them. Realtek also alleges that Nomura did not, and never intended to, provide the Interim Loans. Most important for the purposes of Realtek’s claims of violations of the federal securities laws, however, is the allegation that Nomura intended all along to make additional profits on the refinancing deal by charging up to $14 million in trading fees to the private investors who would buy the participation certificates. Realtek asserts that this intention was inconsistent with its alleged agreement that all proceeds of Nomura’s sale of the participation certificates to investors, less identified transaction costs, would be paid to Realtek and, therefore, the overall interest rate earned by investors would equal that paid by Realtek on the Permanent Loans. Realtek alleges that by charging $14 million in trading fees to the investors, the cost of the Permanent Loans to Realtek would increase by as much as 1.5% or more.
 
 [5]
 

 Based on these allegations, Realtek claims in its second amended complaint that Nomura violated Section 10(b) and Rule 10b-5 of the Securities Exchange Act of 1934. Nomura moves to dismiss the second amended complaint for failure to state a claim upon which relief can be granted.
 

 II.
 

 In deciding a motion to dismiss under Rule 12(b)(6), the Court must take all well-pleaded allegations in the complaint as true and construe those allegations in a light most favorable to the plaintiff.
 
 Summit Health, Ltd. v. Pinhas,
 
 500 U.S. 322, 324, 111 S.Ct. 1842, 1845, 114 L.Ed.2d 366 (1991);
 
 Dana Corp. v. Blue Cross & Blue Shield Mut.,
 
 900 F.2d 882 (6th Cir.1990);
 
 Craighead v. E.F. Hutton & Co.,
 
 899 F.2d 485, 489 (6th Cir. 1990). However, the Court need not accept as true a legal conclusion couched as a factual allegation.
 
 Papasan v. Allain,
 
 478 U.S. 265, 286, 106 S.Ct. 2932, 2944, 92 L.Ed.2d 209 (1986). The Court is to dismiss the complaint “only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations.”
 
 Hishon v. King & Spalding,
 
 467 U.S. 69, 73, 104 S.Ct. 2229, 2232, 81 L.Ed.2d 59 (1984). In order to effectuate the policies underlying the federal securities laws, courts should construe claims for relief under Section 10b and Rule 10b-5 liberally.
 
 Mansbach v. Prescott, Ball & Turben,
 
 598 F.2d 1017, 1024 (6th Cir.1979).
 

 III.
 

 Section 10(b) of the Securities Exchange Act of 1934 provides that
 

 It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or
 
 *579
 
 of the mails, or of any facility of any national securities exchange—
 

 (b) To use or employ, in connection with the purchase or sale of any security ..., any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [Securities and Exchange] Commission may prescribe as necessary or appropriate in the public interest of for the protection of investors.
 

 15 U.S.C. § 78j. The Securities and Exchange Commission has in turn promulgated Rule 10b-5, which provides that
 

 It shall be unlawful for any person, direct ly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
 

 (a) To employ any device, scheme, or artifice to defraud,
 

 (b) To make any untrue statement of a material fact, or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
 

 (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.
 

 17 C.F.R. § 240.10b-5.
 

 Boiled down, a prima facie claim under Section 10(b) and Rule 10b-5 is made up of seven essential elements: (1) the use of an instrumentality of interstate commerce, or a national securities exchange (2) to implement a deceptive or fraudulent practice, with the intent to deceive or defraud (3) in connection with (4) the purchase or sale (5) of a security (6) causing (7) damages.
 
 Craighead v. E.F. Hutton & Co.,
 
 899 F.2d 485, 493 (6th Cir. 1990);
 
 Mansbach,
 
 598 F.2d at 1026 (6th Cir. 1979). Nomura argues that Realtek has failed to allege prongs 3, 4 and 5. This Court disagrees.
 

 A
 
 The Transaction.
 

 Nomura argues that its deal with Realtek really contemplated a very simple loan transaction — one in which Nomura would transfer money to Realtek in exchange for Realtek’s existing mortgages, notes and assigned leases. Nomura would, in turn, pool those mortgages and sell them to investors to finance its own loans to Realtek. Hence, Nomura characterizes the deal as a two-step transaction: one involving a completed loan in return for collateral, and another involving an independent decision by Nomura to transfer the costs of, and some portion of the risk of, that loan to the open market by the sale of shares in the mortgage pool in the form of participation certificates.
 

 Under this scenario, Realtek would be uninvolved in any offer or sale of securities and the ultimate investors in securities would be unaffected by Realtek’s negotiations with its lender, Nomura. The two ends of the transaction would operate independently and, as Nomura points out, would be treated independently under the securities laws. Indeed, at oral argument, counsel for Nomura argued that Nomura acted vis-a-vis Realtek much like Fannie Mae does vis-a-vis individual homeowners who finance their home purchase via a government mortgage.
 

 Nomura is correct that, when a lender takes mortgages as collateral in a traditional loan transaction, those mortgages are generally not deemed securities. And, Nomura is correct that, when lending institutions turn around and securitize their already-existing loans by selling interests in either the loans or the collateral, the original borrowers generally would not be deemed issuers or sellers of those end-product securities.
 

 The transaction alleged in Realtek’s complaint, however, is neither as simple nor as divisible as Nomura asserts. Realtek describes a transaction in which Realtek contemplated all along the distribution of securities to the public (backed by its obligations and properties), and chose an investment banker to design for it a securities distribution through structured financing. Realtek alleges that it was, in fact, involved in the rating, design and distribution of the anticipated securities, through a REMIC entity designed for that purpose,
 
 and
 
 that it was Nomura who insisted that Realtek take on
 
 *580
 
 that role. In the deal Realtek describes, Nomura was to operate effectively as an underwriter whose payments to Realtek should really be described as advances on that activity, rather than as traditional lending transactions.
 

 To the extent Realtek’s allegations are well-pleaded, and not conclusory or wholly unsupported by articulated facts, it is those allegations and, hence, that description of this complex transaction the Court must accept for purposes of this motion.
 

 B. Prong 5
 
 — Realtek
 
 Has Alleged A Security.
 

 “[T]o reach the question of an alleged violation of the anti-fraud provisions of the Securities Acts, the transaction at issue must involve a ‘security.’ ”
 
 Home Guar. Ins. Corp. v. Third Fin. Servs., Inc.,
 
 667 F.Supp. 577, 579 (M.D.Tenn.1987);
 
 Union Planters Nat’l Bank of Memphis v. Commercial Credit Business Loans, Inc.,
 
 651 F.2d 1174, 1179 (6th Cir.1981),
 
 cert. denied,
 
 454 U.S. 1124, 102 S.Ct. 972, 71 L.Ed.2d 111 (1981) (whether a “security” exists is a “threshold inquiry”). Nomura insists that Realtek does not make the necessary threshold showing because Realtek was obliged to transfer to Nomura only the notes and mortgages on certain properties. Nomura argues that these notes and mortgages are not “securities” for purposes of the securities laws. This argument fails for two reasons.
 

 First, as noted above, Realtek alleges the parties agreed Realtek had two options from which to choose how the interest rate on its Permanent Loans would be determined. Realtek agrees that, under the “Nomura bears the rating agency risk option,” Realtek would merely transfer to Nomura notes and mortgages on certain properties, which, in turn, would transfer them to a REMIC entity. Realtek alleges, however, that under the “Realtek bears the rating agency risk option,” Realtek was obliged to issue
 
 rated securities
 
 to a REMIC entity for repackaging and resale by Nomura. Of course, a bald allegation that an instrument is a “security” will not, alone, protect a plaintiff from a motion to dismiss. But Realtek’s allegation of its obligation to rate and issue securities is not bald. Ethan Penner, who is president of defendant Nomura Asset and managing director of defendant Nomura Securities — and thus clearly has reason to know what is and is not a “security” under the securities laws — wrote that Realtek would be the “issuer of rated securities that would be purchased by Nomura.” Second Amended Complaint Ex. Z at 2. Realtek’s allegation that the instruments it would be transferring to the REMIC entity would be “securities” is, thus, at least colorable. Also, it is notable that, under the “Realtek bears rating agency risk option,” the parties could not determine the Permanent Loan interest rate until the credit rating agencies had completed all the evaluation necessary to rate the “end-product” participation certificates. Thus, enough underlying information would have existed at the “middle” of the deal for Realtek to “issue rated securities that would be purchased by Nomura.” For these reasons alone, Realtek sufficiently alleges prong 5 of a prima facie claim under Section 10(b) and Rule 10b-5.
 

 There is a second, additional basis for holding that Realtek sufficiently alleges prong 5 of a prima facie claim. The Court finds that, even if the parties contemplated that Realtek would merely transfer notes and mortgages on certain properties — and not rated securities — Realtek has
 
 still
 
 sufficiently alleged a security for purposes of stating a claim for violation of the federal securities laws. This conclusion is most easily explained by the following example:
 

 a two-year note an insurance company receives for its $10 million loan to a corporation is almost certainly not a security. But, if the insurance company then causes the $10 million note to be divided into 10,000 notes each of $1,000 face value which are sold to the public, those 10,000 notes are just as certainly securities.
 
 Indeed, the $10 million note would be a security when owned by the insurance company if the insurance company had, at the time the insurance company was irrevocably committed to make the loan, intended to distribute the 10,000 notes to the public.
 

 
 *581
 
 Arnold S. Jacobs, 5B
 
 Litigation and Practice Under Rule 10b-5
 
 § 38.03[dd][ii] at 2-386 (release # 26, 6/1991) (emphasis added).
 

 Professor Jacobs’ analysis was used in
 
 Banco Nacional de Costa Rica v. Bremar Holdings,
 
 492 F.Supp. 364 (S.D.N.Y.1980). In
 
 Banco Nacional,
 
 a borrower obtained a loan “to finance the purchase of an essential asset of a new corporation.”
 
 Id.
 
 at 369. The borrower gave the lender ten promissory notes evidencing the loan. From the start, the lender “intend[ed] to recover at least some of its expenditure immediately by selling or hypothecating the notes in the secondary market.”
 
 Id.
 
 In fact, the lender specifically obtained ten promissory notes, instead of only one, “precisely to facilitate their placement in the secondary market.”
 
 Id.
 
 The
 
 Banco Nacional
 
 court found that the ten promissory notes were “securities” and denied the defendants’ motion to dismiss, noting:
 

 in the hands of those investors to whom [the lender] sold them, the notes are beyond peradventure “securities”; it would be anomalous to conclude that nonetheless they were not while held by [the lender],
 
 which took them with the express intention of marketing them.
 

 Id.
 
 at 369 n. 3 (emphasis added).
 

 As
 
 Banco Nacional
 
 and Professor Jacobs’ analysis make clear, even under Nomura’s characterization of the parties’ agreement, the mortgage notes Realtek was to give to the REMIC entity are securities. Realtek has certainly alleged (and Nomura does not dispute) that, at the time it committed to make the Permanent Loans, Nomura intended to pool the Permanent Loan notes and distribute participation certificates to the public. Indeed, it made a commitment to Realtek that it would, in fact, do so. The sale of participation certificates to the public was an integral part of the transaction alleged and the transaction evidenced by the Commitment Letter.
 

 Despite Nomura’s contention to the contrary, the alleged transaction, though complex, was a fairly integrated one — not a series of independent steps. Realtek’s obligations under the Permanent Loans could ultimately depend on the price charged for the participation certificates to private investors, and the price and value of the interests purchased at the end of the deal were dependent upon the performance evaluations of Realtek’s properties. The “loan” piece of the transaction simply could not have been completed absent the rating of the participation certificates.
 

 The participation certificates which Nomura and Realtek contemplated would be sold to investors almost certainly would have been securities; Nomura does not argue otherwise. 15 U.S.C. § 78c(a)(ll) (definition of an “equity security”); 17 C.F.R. § 240.3all-l (defining an “equity security” to include a “certificate of ... participation in any profit sharing agreement”).
 
 [6]
 
 Because the participation certificates are securities, the mortgages and notes given by Realtek for the precise purpose of creating those certificates are, in the unique circumstances of this transaction, also securities. For this reason, as well, Realtek has sufficiently alleged a security for purposes of stating a claim for violation of the federal securities laws.
 
 [7]
 

 
 *582
 

 C. Prong k
 
 — Realtek
 
 Has Alleged A Purchase Or Sale.
 

 Generally, only purchasers and sellers of securities have standing to bring a private cause of action under Rule 10b-5.
 
 See Blue Chip Stamps v. Manor Drug Stores,
 
 421 U.S. 723, 749, 95 S.Ct. 1917, 1931, 44 L.Ed.2d 539 (1975). Nomura argues that Realtek has not alleged sufficiently that it falls into either category.
 

 As noted, the parties strenuously disagree over whether, pursuant to their refinancing agreement, it was contemplated that Realtek would sell securities.
 
 [8]
 
 Nomura insists the parties’ agreement contemplates that the only entity which would sell securities was Nomura, and those securities would be the participation certificates at the “end” of the deal. Realtek responds that, under the “retain rating agency risk” option,
 
 it
 
 was obligated to create a RE MIC entity through which it would sell rated securities to Nomura in the “middle” of the deal.
 
 [9]
 
 The Court will not and should not resolve this factual dispute in the context of a motion to dismiss under Rule 12(b)(6). Rather, the Court must determine only whether Realtek sufficiently
 
 alleges
 
 it was obliged to sell a security, and whether that allegation is completely specious.
 

 Realtek has sufficiently alleged that, under the terms of the securitization deal and the “retain rating agency risk” option, it had a duty to sell rated securities to Nomura.
 
 [10]
 
 And, Realtek has a colorable basis for this allegation; Nomura, itself, wrote a letter to Realtek stating that “[t]he Commitment Letter contemplates a securitized loan where Realtek or a related company
 
 would be the issuer of rated securities that would be purchased by Nomura”
 
 Second Amended Complaint Ex. Z at 2 (emphasis added). Pursuant to Rule 12(b)(6), the Court must accept a well-pleaded allegation as true. Accordingly, for this reason alone, Realtek sufficiently alleges prong 4 of a prima facie claim under Section 10(b) and Rule 10b-5.
 

 There is, again, an independent reason to find that the transaction included an agreement by Realtek to transfer securities to Nomura. If, by virtue of the integrated nature of this structured financing, the notes and mortgages which were pooled to form the source of the participation certificates can be deemed securities at the time of their transfer, Realtek must undoubtedly be considered a “seller” of those securities.
 
 See
 
 15 U.S.C. § 78c(a)(14) (sale includes any contract to “sell or otherwise dispose of’ securities). This is true, even absent any obligation on Realtek’s part to sell rated securities to Nomura. The structured financing Realtek and the Commitment Letter describe is one in which a transfer of mortgages and notes from Realtek was
 
 only
 
 to occur for purposes of facilitating their ultimate securitization. Accordingly, under
 
 Banco Nacional, supra,
 
 and the rationale upon which the result in that case was premised,
 
 *583
 
 Realtek would and should be deemed a seller of securities for purposes of Rule 10b-5.
 

 D. Prong S
 
 — Realtek
 
 Has Alleged, Fraud “In Connection With” A Security.
 

 The third prong of a prima facie claim for violation of the federal securities laws is that the alleged fraud must be “in connection with” the purchase or sale of a security. The “in connection with” requirement “mandates that the alleged fraud concern the fundamental
 
 nature
 
 of the [securities]: namely, the characteristics and attributes that would induce an investor to buy or sell the particular [securities].”
 
 Kearney v. Prudential-Bache Secs., Inc.,
 
 701 F.Supp. 416, 424 (S.D.N.Y.1988) (emphasis in original). This requirement, however, is not as limiting as Nomura contends in its current motion. The Supreme Court has made clear that the phrase ‘in connection with’ “must be read flexibly, not technically and restrietively.”
 
 Superintendent of Ins. v. Bankers Life & Cos. Co.,
 
 404 U.S. 6, 12, 92 S.Ct. 165, 169, 30 L.Ed.2d 128 (1971). Thus, while it is not enough to allege that a fraud has occurred in one of a series of transactions of which a sale of a security is merely a part, all that is required is a reasonable nexus between the alleged fraud and the purchase or sale of the security, not a “direct and close relationship.”
 
 Abrams v. Oppenheimer Government Securities,
 
 737 F.2d 582 (7th Cir.1984). Put another way, “[f]or the ‘in connection with’ requirement to be satisfied, it is enough that the fraud ‘touch’ the sale in some manner. The requirement is satisfied, for example, if the purchase or sale of a security and the proscribed conduct are part of the same fraudulent scheme.”
 
 Rudolph v. Arthur Andersen & Co.,
 
 800 F.2d 1040, 1046 (11th Cir.1989).
 

 Nomura focuses on the participation certificates as the relevant securities, and argues that any relationship between these certificates and the alleged fraud was “incidental at best.” If the facts are as Nomura contends, and the sale of the participation certificates was contemplated as a distinct and separable phase of the transaction, Nomura’s argument about the ‘in connection with requirement’ might be well-taken.
 

 As noted, however, Realtek’s description of the transaction differs materially from Nomura’s. Realtek alleges that: (1) Nomura intended to charge up to $14 million in trading fees to the private investors who bought the participation certificates; and (2) Nomura purposefully hid this fact from Realtek. Under Realtek’s description of the transaction and the relationship between its various aspects, these fees would materially impact both the interest rate Realtek would ultimately be obligated to pay on the Permanent Loans and the end price of the participation certificates to the private investors, artificially increasing both. Thus, the “cost” of the transaction both to Realtek and to the private investors would be increased by Nomura’s trading fees, thereby decreasing the effective rate of return on, and the appeal of, the participation certificates. Even if one concedes that the participation certificates are the only relevant security for purposes of this analysis, given the integrated nature of the transaction Realtek alleges, the “in connection with” requirement would be sufficiently satisfied.
 

 Moreover, as discussed above, Realtek alleges
 
 it
 
 was obliged to issue securities under the “Realtek bears the rating agency risk” option. Realtek alleges that the parties agreed Nomura would pay Realtek a price certain for these “mid-deal” securities. Nomura’s purchase price would be the Permanent Loan amount of about $165 million, minus the
 
 3%
 
 investment fee and certain due diligence costs. Realtek claims the additional $14 million in profits Nomura would allegedly have made on the sale of participation certificates would ultimately be financed by Realtek. Thus, Realtek alleges that, by failing to describe its anticipated trading profits, Nomura tried to defraud Realtek into unknowingly accepting less than the agreed-upon price for Realtek’s securities. Again, while Nomura disputes this characterization of the deal, it certainly constitutes an allegation of fraud “in connection with” securities.
 

 Finally, if, as noted, the mortgages and notes to be transferred in return for the Permanent Loans, and in furtherance of the
 
 *584
 
 securitization, are deemed securities, Realtek has alleged numerous fraudulent acts “in connection with” that aspect of the transaction.
 

 Accordingly, while real questions remain about whether Realtek will be able to prove the fraudulent scheme it has alleged, and whether Realtek’s own knowledge and actions might bar recovery, regardless of the claim pursued, Realtek has sufficiently alleged a prima facie claim under Section 10(b) and Rule 10b-5.
 

 IV.
 

 It is unwise to “dismiss a complaint merely because the alleged scheme does not involve the type of fraud that is ‘usually associated with the sale or purchase of securities.’”
 
 Superintendent of Ins. of N.Y. v. Banker’s Life & Cas. Co.,
 
 404 U.S. 6, 10 n. 7, 92 S.Ct. 165, 169 n. 7, 30 L.Ed.2d 128 (1971) (quoting
 
 A.T. Brod & Co. v. Perlow,
 
 375 F.2d 393, 397 (2d Cir.1967), which in turn quoted and reversed the district court). Realtek alleges that it and Nomura entered into a complex refinancing agreement that is relatively new in the financial markets. Just as the securitization of commercial mortgages is a novel financing mechanism, so is the method Realtek alleges Nomura used to defraud it. Nonetheless, Realtek’s second amended complaint contains well-pleaded, colorable allegations containing all the necessary elements of a prima facie claim of violation of the federal securities laws. Accordingly, Nomura’s motion to dismiss the second amended complaint is DENIED.
 

 IT IS SO ORDERED.
 

 [1]
 

 . Appended to Realtek’s second amended complaint are a large number of exhibits. These documents are a part of the complaint for all purposes, including the purpose of determining what the complaint alleges. FedR.Civ.P. 10(c);
 
 see Hall v. Bellmon,
 
 935 F.2d 1106, 1112 (10th Cir.1991) (written documents attached to the complaint as exhibits are considered part of the complaint for consideration in a rule 12(b)(6) dismissal);
 
 Goldman v. Belden,
 
 754 F.2d 1059, 1065-66 (2d Cir.1985) (same). The Court does not look to any of the appended exhibits as "matters outside the pleading” for purposes of determining issues of fact; rather, the Court examines the exhibits solely for the purpose of determining the legal sufficiency of Realtek’s claims, which are based on the facts and allegations documented in the exhibits. Thus, the Court does not convert Realtek’s motion to dismiss into a motion for summary judgment pursuant to Fed.R.Civ.P. 12(b).
 
 See Kentucky State Dist. Council of Carpenters, AFL-CIO v. Wehr Constructors, Inc.,
 
 1993 WL 288277 at *3 n. 2 1 F.3d 1241 (6th Cir. July 28, 1993) (discussing how exhibits to a complaint affect whether a motion to dismiss must be converted into a motion for summary judgment).
 

 [2]
 

 . Entire treatises have been written on the method of financing contemplated by Nomura and Realtek.
 
 See generally
 
 Tamar Frankel,
 
 Securitization
 
 — Structured.
 
 Financing, Financial Assets Pools, and Asset-Backed Securities
 
 (1991);
 
 Securitization; Asset-Backed and Mortgage-Backed Securities
 
 (Ronald S. Borod ed., 1991).
 

 [3]
 

 . The parties sharply disagree on whether they contemplated that Realtek would sell securities
 
 *578
 
 because the viability of Realtek's securities claims depends, in part, on whether Realtek was a "seller” of securities. As noted below in Section III.B of this memorandum, however, the Court finds that Realtek states a claim
 
 regardless
 
 of whether it was obliged in the "middle” of the transaction to “sell rated securities” to the REM-IC entity for Nomura's eventual resale to investors.
 

 [4]
 

 . Put differently, Realtek alleges Nomura told it the transactions would be "bid at par.”
 

 [5]
 

 . Realtek also notes that the worse the credit rating agencies' evaluations of Realtek's properties, the more Nomura could make in trading profits on the participation certificates. Realtek alleges that this entire scheme created egregious undisclosed conflicts of interest for Nomura.
 

 [6]
 

 . Interestingly, at least two courts have held that under certain circumstances, a fractional undivided equity interest in a pool of mortgages— which is what the participation certificates were intended to be — is
 
 not
 
 a security for purposes of Section 10(b)/Rule 10b-5 claims.
 
 In re National Mortg. Equity Corp.,
 
 723 F.Supp. 497 (C.D.Cal. 1989);
 
 In re EPIC Mortg. Ins. Litig.,
 
 701 F.Supp. 1192, 1247-49 (E.D.Va.1988),
 
 affd. in part, rev’d in part on other grounds sub nom. Foremost Guar. Corp. v. Meritor Sav. Bank,
 
 910 F.2d 118 (4th Cir.1990). Without question, however, the leading legal experts concur that mortgage-backed "securitized” instruments sold as investments should be regarded as "securities,” which fall under the protection of the federal securities acts. 2 Tamar Frankel,
 
 Securitization
 
 — Struc
 
 tured Financing, Financial Assets Pools, and Asset-Backed Securities
 
 § 12.2 (1991 & Supp.1995); Park McGinty,
 
 What is a Security?,
 
 1993 Wis. L.Rev. 1033, 1103-06 (1993);
 
 Securitization:
 
 As
 
 set-Backed and Mortgage-Backed Securities
 
 §§ 5.02-03 (Ronald S. Borod ed., 1991); Paula C. Murray & Beverly L. Hardaway,
 
 Mortgage-Backed Securities: An Investigation of Legal & Financial Issues,
 
 11 J.Coip.L. 203, 220-22 (1986). As noted, Nomura does not argue that the participation certificates it intended to issue would not have been "securities."
 

 [7]
 

 . This Court's obligation is to assess the economic realities of a transaction when detemúning whether and how the securities laws should ap
 
 *582
 
 ply to it. Nomura’s attempt to carve the transaction described in the complaint into discrete, unrelated segments fails to do justice to the complex and somewhat ingenious nature of the transaction these parties contemplated and hoped to complete. The parties initiated their deal with every phase intentionally structured so that each depended upon the form of the others.
 

 [8]
 

 . The parties have focused on whether, under the terms of the proposed refinancing, Realtek was supposed to
 
 sell
 
 securities. In fact, Realtek may have an argument that under the terms of the deal, it was supposed to
 
 buy
 
 securities — the entire class of "R certificates,’’ representing the right to payment of "residual income” received by the mortgage pool and not paid to holders of the other four classes of certificates. Because the parties did not focus on this argument, however, the Court does not resolve this question.
 

 [9]
 

 . As Nomura points out, Realtek, somewhat cavalierly, characterizes itself as both an "issuer” and a “seller” as if the terms were interchangeable, which they are not. Realtek's primary emphasis, however, is on its alleged role as a "seller” of rated securities, regardless of which entity is deemed the "issuer" of those securities. It is not necessary in the context of the present motion, therefore, to determine whether it is Realtek or the contemplated REMIC entity which is most accurately described as the contemplated "issuer” of those securities.
 

 [10]
 

 . For purposes of the securities laws, a "sale” of securities includes a
 
 contractual duty
 
 to sell securities, whether or not the sale actually takes place. 15 U.S.C. § 78c(a)(14). Thus, even though Realtek does not allege it ever completed the sale of any securities, the allegation that it had a contractual duty to do so is sufficient.