# Third District Court of Appeal

## State of Florida

Opinion filed July 9, 2025.
Not final until disposition of timely filed motion for rehearing.

————————

No. 3D24-0533
Lower Tribunal No. 22-8527-CA-01

————————

**ACF IV, LLC, et al.,**
Appellants,

vs.

**FDI Capital, LLC,**
Appellee.

An Appeal from the Circuit Court for Miami-Dade County, Lisa S. Walsh, Judge.

Greenberg Traurig, P.A., Elliot H. Scherker, and Bethany J. M. Pandher, for appellants.

Berger Singerman LLP, Alejandro M. Miyar, P. Benjamin Zuckerman, Maxwell H. Sawyer, and Ana E. Kauffmann, for appellee.

Before SCALES, C.J., and EMAS, and MILLER, JJ.

MILLER, J.

The dispositive issue in this appeal is whether certain loan participation agreements constitute securities subject to registration requirements under Florida law. Appellants, ACF IV, LLC, Juan Carlos Zurita, and Rodrigo Lopez, challenge a final judgment finding them liable for selling unregistered securities to appellee, FDI Capital, LLC, in violation of section 517.12(1), Florida Statutes (2018). On appeal, appellants contend that the loan participation agreements ACF executed with FDI were not securities, but instead analogous to traditional commercial loans, and therefore the trial court erred in imputing liability. We have jurisdiction. See Fla. R. App. P. 9.030(b)(1)(A).

I

ACF is an entity engaged in extending loans to domestic and international businesses. ACF and FDI executed two loan participation agreements in November 2018 and April 2019. The agreements required FDI to contribute a total of $5 million to fund 80% of two collateralized, short-term loans ACF extended to a Mexican corporation, RCS of Stamping, S.A. de C.V. ACF retained a 20% interest in the loans and was responsible for both administering the loans and distributing payments from RCS to FDI on a pari passu basis. The loans bore a fixed rate of interest, and FDI treated them internally as assets or accounts receivable. The agreements required

the parties' unanimous approval for any reduction or waiver of indebtedness, release or substitute of collateral, release of any party from liability for repayment, or modification or waiver of any rights under the loans.

Although FDI performed its own due diligence prior to participating, RCS defaulted on both loans in September 2019. ACF brought suit against RCS in Mexico, and FDI filed a seven-count complaint against appellants in Miami-Dade County, Florida. The complaint alleged that all three appellants violated section 517.12(1) by selling unregistered securities in the State of Florida and sought rescission of the agreements, consistent with the statute. See § 517.211(1), Fla. Stat. (2018). The parties filed cross-motions for summary judgment.

The trial court granted summary judgment in favor of FDI, finding that the participation agreements were securities under section 517.021(22)(s), Florida Statutes (2018), and Zurita and Lopez were acting as ACF's agent in soliciting FDI's participation. In reaching this conclusion, the court relied upon the plain language of the statute and further found instructive the test set forth in S.E.C. v. W.J. Howey Co., 328 U.S. 293 (1946), and a progeny case, United Housing Foundation, Inc. v. Forman, 421 U.S. 837 (1975).

3

FDI then voluntarily dismissed its remaining claims without prejudice and obtained an executable final judgment for $5,792,971.21. This appeal ensued.

## II

We conduct a de novo review of an order granting summary judgment. See Fla. Retail Fed'n, Inc. v. City of Coral Gables, 282 So. 3d 889, 892 (Fla. 3d DCA 2019). Issues of statutory interpretation are similarly reviewed de novo. Id.

## III

## A

Known as the "Florida Securities and Investor Protection Act," Chapter 517, Florida Statutes (2018), is purposed "to protect the public from fraudulent and deceptive practices in the sale and marketing of securities." Arthur Young & Co. v. Mariner Corp., 630 So. 2d 1199, 1203 (Fla. 4th DCA 1994); see also § 517.011, Fla. Stat. (2018). To that end, section 517.07(1), Florida Statutes (2018), provides in pertinent part,

> It is unlawful and a violation of this chapter for any person to sell or offer to sell a security within this state unless the security is exempt under s. 517.051, is sold in a transaction exempt under s. 517.061, is a federal covered security, or is registered pursuant to this chapter.

"Security" is statutorily defined as encompassing a myriad of instruments, including a note, a stock, an investment contract, a beneficial interest in title to property, profits, or earnings, or, as relevant here, an interest in or under a profit-sharing or participation agreement or scheme. See § 517.021(22), Fla. Stat. Although this definition is indubitably expansive, it comes with an express legislative caveat. The listed instruments constitute securities "unless the context otherwise indicates," and the term "participation agreement" is not defined. See § 517.021, Fla. Stat.

Chapter 517 is modeled after federal securities laws. Consequently, federal interpretations guide our analysis in interpreting the statute absent any conflict with Florida law. See Ward v. Atl. Sec. Bank, 777 So. 2d 1144, 1147 (Fla. 3d DCA 2001) ("Florida courts will look to interpretations of the federal securities laws for guidance in interpreting Florida's securities laws."); Honig v. Kornfeld, 339 F. Supp. 3d 1323, 1335 (S.D. Fla. 2018) ("'[T]he definition of "security" under the Florida statute is the same as that under federal law, . . . [so] we look to federal law' in determining whether an instrument is a security.") (quoting Phillips v. Kaplus, 764 F.2d 807, 814–15 n.8 (11th Cir. 1985), and citing Wiener v. Brown, 356 So. 2d 1302 (Fla. 3d DCA 1978)) (alterations in original).

**B**

Some history of the federal securities laws is therefore necessary. "In response to the sudden and disastrous collapse in prices of listed stocks in 1929, and the Great Depression that followed, Congress enacted the Securities Act of 1933 . . . and the Securities Exchange Act of 1934 . . . ." Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit, 547 U.S. 71, 78 (2006) (citations omitted). The 1933 Act was mainly designed to "provide investors with full disclosure of material information concerning public offerings of securities in commerce," and the 1934 Act principally intended "to protect investors against manipulation of stock prices through regulation of transactions upon securities exchanges and in over-the-counter markets . . . ." Ernst & Ernst v. Hochfelder, 425 U.S. 185, 195 (1976). In this vein, "Congress [purposed] the securities laws to cover those instruments ordinarily and commonly considered to be securities in the commercial world . . . ." Marine Bank v. Weaver, 455 U.S. 551, 559 (1982).

The Securities Acts are strikingly similar to the Florida Act, as they too define the word "security" to include participation agreements and reference "virtually any instrument that might be sold as an investment." Reves v. Ernst

6

& Young, 494 U.S. 56, 61 (1990).[1]  Like in Florida, the broad statutory definitions are preceded by the statement that the enumerated instruments are not securities if "the context otherwise requires . . . ."  Compare 15 U.S.C. § 77b(a)(1) (2018), and 15 U.S.C. § 78c(a) (2018), with § 517.021, Fla. Stat.

Given the contextual caveats, courts have concluded that neither the federal nor the Florida statutes should be technically or statically construed. See, e.g., Smith Int'l, Inc. v. Tex. Com. Bank, 844 F.2d 1193, 1199 n.4 (5th Cir. 1988) (noting it is "well settled that the[] definitional sections" of the federal Acts "are not read literally"); Arthur Young, 630 So. 2d at 1202 ("[T]he definitions apply throughout the provisions of . . . chapter [517] unless the context of a particular section 'otherwise indicates.' . . .  '[C]ontext' invites the reader to make both a search for what the internal text means and what comprises the external context of the statute, namely, what is the problem which the legislature addressed in the statute.  Thus, the external context plays a part in determining what the text means.").  Instead, the statutorily delineated instruments must be viewed flexibly and through a comparative

_____

[1] "The same Congress which passed the Securities Act in 1933 approved the Securities Exchange Act in 1934, and the definition of security contained in the 1934 Act is virtually identical to that in the earlier enactment." Tcherepnin v. Knight, 389 U.S. 332, 342 (1967).

lens to determine whether they bear the hallmarks of traditional "securities."
See S.E.C. v. Zandford, 535 U.S. 813, 819 (2002).

**C**

Because the instruments in this case are labeled "participation agreements," we begin with the presumption that they fall within the statutory definition. See § 517.021(22)(s) ("'Security' includes . . . [a]n interest in or under a . . . participation agreement . . . ."); 940 Ocean Drive, LLC v. Sobe USA, LLC, 403 So. 3d 1048, 1055 (Fla. 3d DCA 2025) ("In interpreting the statute, we follow the supremacy-of-text principle—namely, the principle that the words of a governing text are of paramount concern, and what they convey, in their context, is what the text means.") (quoting Ham v. Portfolio Recovery Assocs., LLC, 308 So. 3d 942, 946 (Fla. 2020)) (internal quotation marks and alterations omitted). We are then dutybound to consider whether "the context" of the transactions "otherwise indicates." See § 517.021, Fla. Stat.

Several cases guide our analysis. In the seminal decision of S.E.C. v. W.J. Howey Co., 328 U.S. 293 (1946), the Supreme Court formulated a three-prong test to determine whether an instrument constitutes an "investment contract" subject to securities regulations. An investment contract exists if there is (1) an investment, (2) in a common enterprise, (3)

8

with profits expected from the efforts of others.  See Howey, 328 U.S. at 298–99.

In a later decision, Marine Bank v. Weaver, 455 U.S. 551, 553 (1982), the Court took a common-sense approach to determining whether a business arrangement constituted a security.  There, a couple used their certificate of deposit as collateral for a loan that a bank extended to a meatpacking company.  See id. at 552–53.  In return, the couple would receive 50% of the company's net profits, $100 per month throughout the duration of the loan, use of the company's barn and pasture, and the power to decline any future loans.  See id. at 553.

The lower court determined the arrangement could be viewed as a "certificate of interest or participation in any profit-sharing agreement" or an "investment contract[,]" thereby placing it within the ambit of the Securities Acts.  See id. at 559.  The Supreme Court disagreed, stressing that "Congress intended the securities laws to cover those instruments ordinarily and commonly considered to be securities in the commercial world . . . ."  Id. The Court noted that "[t]he unusual instruments found to constitute securities in prior cases involved offers to a number of potential investors, not a private transaction as in this case."  Id.  The Court then cited examples of instruments in which there was "common trading," including one agreement

9

with 42 common investors and another involving 1,000 prospects.  See id. at 559–60 (citing Howey, 328 U.S. at 295, and Sec. & Exch. Comm'n v. C. M. Joiner Leasing Corp., 320 U.S. 344, 346, 351 (1943)).  The Court further observed that veto authority over future loans provided a measure of control not characteristic of a security and ultimately concluded that the "unique agreement, negotiated one-on-one by the parties, [was] not a security."  Id. at 560.

In a third decision, Landreth Timber Co. v. Landreth, 471 U.S. 681 (1985), the Court renounced Howey as applied to "stocks."  In so doing, the Court explained that the test "was designed to determine whether a particular instrument is an 'investment contract,' not whether it fits within any of the examples listed in the statutory definition of 'security.'"  Id. at 691.  Hence, "applying the Howey test to traditional stock and all other types of instruments listed in the statutory definition would make the Acts' enumeration of many types of instruments superfluous."  Id. at 692.

Finally, in Reves v. Ernst & Young, 494 U.S. 56 (1990), the Court similarly rejected Howey in cases involving notes.  There, the Court held that

10

the "family resemblance" test instead should resolve whether "notes" are securities.  See id. at 67–70.[2]

In the aftermath of Howey, federal courts have nearly universally found that private loan participation agreements do not constitute securities.  Most have deployed the Howey formula.  See, e.g., Union Planters Nat'l Bank v. Com. Credit Bus. Loans, Inc., 651 F.2d 1174, 1185 (6th Cir. 1981); United Am. Bank v. Gunter, 620 F.2d 1108, 1115 (5th Cir. 1980); McVay v. W. Plains Serv. Corp., 823 F.2d 1395, 1399 (10th Cir. 1987); Union Nat'l Bank v. Farmers Bank, Hamburg, 786 F.2d 881, 884–85 (8th Cir. 1986); Kan. State Bank in Holton v. Citizens Bank, 737 F.2d 1490, 1494–95 (8th Cir. 1984); Am. Fletcher Mortg. Co., Inc. v. U.S. Steel Credit Corp., 635 F.2d 1247, 1254 (7th Cir. 1980); Robbins v. First Am. Bank, 514 F. Supp. 1183, 1187–89 (N.D. Ill. 1981).  Others have applied Reves to arrive at the same conclusion. See Banco Espanol, 973 F.2d at 54–56.

---

[2] Under this test, "a note is presumed to be a security unless an examination of the note, based on four factors, reveals a strong resemblance between the note and one of a judicially[]enumerated list of instruments that are not securities."  Banco Espanol de Credito v. Sec. Pac. Nat'l Bank, 973 F.2d 51, 55 (2d Cir. 1992).  The four factors examine (1) the motivations prompting a reasonable seller and buyer to enter the transaction; (2) the plan of distribution of the instrument; (3) the reasonable expectations of the investing public; and (4) whether some factor such as the existence of another regulatory scheme reduced the risk of the instrument.  Reves, 494 U.S. at 66–67.

11

Although most federal courts agree on their approach to analyzing participation agreements, the jurisprudence following <u>Howey</u> is somewhat murky. <u>See</u> Maura K. Monaghan, <u>An Uncommon State of Confusion: The Common Enter. Element of Inv. Cont. Analysis</u>, 63 Fordham L. Rev. 2135, 2171 (1995) ("Forty-nine years after the <u>Howey</u> decision, the situation is not just confusion but chaos. Neither offerors nor purchasers can be certain of the rule that applies to their transaction and therefore neither are able to plan their activities."); Kaj Ahlburg, <u>The Status of Note Participations Under the Fed. Secs. Acts</u>, 8 Harv. J.L. & Pub. Pol'y 465, 472–73 (1985) (explaining that "[c]ourts have not been as neat in applying and explaining their application of the <u>Howey-Forman</u> test as the theorist might wish[,]" utilizing the test "indiscriminately" and "with varying degrees of zeal"); <u>cf.</u> J. Thomas Cookson, <u>Loan Participation Agreements As Secs.: Jud. Interpretations of the Secs. Act of 1933 and the Secs. Exch. Act of 1934</u>, 24 Wm. & Mary L. Rev. 295, 300 (1983) ("Not all loan participation agreements qualify as securities under the judicially devised tests for notes and investment contracts, but under certain circumstances, loan participation agreements are securities."). But regardless of the analysis, the courts have been united in finding that "[t]he securities laws are not a panacea for commercial loans gone awry." <u>See, e.g.</u>, <u>Union Planters</u>, 651 F.2d at 1185; <u>cf.</u> Dennis Scholl

& Ronald L. Weaver, <u>Loan Participations: Are They "Secs."?</u>, 10 Fla. St. U. L. Rev. 215, 231 (1982) ("Application of the securities laws in a failed loan participation context is typically inequitable and creates the potential of giving one sophisticated investor an unexpected and undeserved windfall at the expense of another in the event a loan in which they have agreed to share the risk goes into default.").

**D**

Against this landscape, we examine the specifics of the case at hand. As previously indicated, we begin with the presumption that the participation agreements fall within the regulatory ambit because the legislature included them in the text of the statute. <u>See</u> § 517.021(22)(s), Fla. Stat.; <u>940 Ocean Drive</u>, 403 So. 3d at 1055. But the legislature equally saw fit to direct us to examine the economic reality of the transaction before classifying an instrument as a security. <u>See</u> <u>Arthur Young</u>, 630 So. 2d at 1202 ("'[C]ontext' invites the reader to make both a search for what the internal text means and what comprises the external context of the statute . . . ."); <u>Tcherepnin</u>, 389 U.S. at 336 ("[I]n searching for the meaning and scope of the word 'security' in the Act, form should be disregarded for substance and the emphasis should be on economic reality."). We must therefore determine whether the context otherwise requires. <u>See</u> § 517.021, Fla. Stat.

13

Here, FDI performed its own due diligence into RCS prior to executing the participation agreements, and any significant decisions required unanimity among the parties. Although ACF serviced the loans, FDI retained typical lender rights, such as the power to authorize foreclosure or require written consent prior to acceleration. These factors evidence a degree of control atypical of a security. See Youmans v. Simon, 791 F.2d 341, 346 (5th Cir. 1986) ("Agreements negotiated one-on-one creating enterprises in which investors are actively involved, knowledgeable, and able to protect their interests are not within the ambit of the federal securities laws."); Marine Bank, 455 U.S. at 560 ("[T]he provision that the Weavers could veto future loans gave them a measure of control over the operation of the slaughterhouse not characteristic of a security.").

The loans were collateralized and payable in fixed amounts at specified times. There was no public offering. Participation was not available to a number of investors, but instead offered to FDI in conjunction with an ongoing business relationship. See id. (finding no security where no prospectus was distributed to the investing couple or "other potential investors[] and the unique agreement . . . was not designed to be traded publicly"). This arrangement is no different than that expected in any ordinary commercial transaction.

14

An analysis under Howey yields no different conclusion. There was no common venture. Multiple investors did not pool their funds to share in profits, S.E.C. v. SG Ltd., 265 F.3d 42, 49 (1st Cir. 2001), the fortunes of ACF and FDI were not so linked that they would rise and fall together, Friel v. Dapper Labs, Inc., 657 F. Supp. 3d 422, 435 (S.D.N.Y. 2023), and FDI was not reliant on ACF's expertise to receive a return on its participation, Mordaunt v. Incomco, 686 F.2d 815, 817 (9th Cir. 1982).

Moreover, FDI only expected to receive repayment of the principal it loaned, along with interest at a fixed rate, in a year's time. There was no anticipated appreciation in the value of the participation tied to the entrepreneurial efforts of others. ACF was charged with administering the loan and distributing payments on a pari passu basis. This equates to routine loan monitoring and servicing. See, e.g., Kan. State Bank, 737 F.2d at 1495 (holding no security existed under Howey where the participating bank had "no prospect of capital appreciation" but only a fixed rate of return based solely on the borrower's ability to repay the loan and the other participating bank's administrative tasks in remitting principal and interest as it was received from the borrower not "'entrepreneurial or managerial' but simply an efficient way to service a participation loan"); Union Planters, 651 F.2d at 1185 ("The profit which would accrue to the Bank in the form of interest

15

earnings was contingent only upon the passage of time[] and was not of a different nature than in a commercial lending transaction. . . . The interest income which was to be paid to the Bank . . . was to be derived from the efforts of Donalds in retailing furniture. These efforts, in the long run, were unsuccessful and eventually resulted in bankruptcy, but they were not the efforts of [the financing company] and therefore the legal test of Howey-Forman has not been satisfied."); Farmers Bank, 786 F.2d at 885 ("Union had no prospect of capital appreciation or profit from any increased earnings in the business. [And] the requirement that profits 'be derived from the entrepreneurial or managerial efforts of others' is not satisfied. Union's return was based solely upon Tucker Oil's ability to repay the loan since Farmers' role was primarily administrative."). Accordingly, we conclude the participation agreements were routine commercial transactions beyond the purview of the Florida Act. We therefore reverse the final order under review and remand for further proceedings.

Reversed and remanded.